BROWN *et al. v.* MONTGOMERY *et al.*

It is a fraudulent suppression, avoiding the sale of commercial paper, for the vendor to withhold information that the makers' check, upon the bank in which they kept their account, had been protested, though the vendor's informant accompanied his statement with the expression of his opinion that the makers were perfectly solvent.

The non-payment of a check, drawn by a commercial house upon its bankers, is evidence upon the question of insolvency; and, *it seems,* if unexplained, of itself warrants that inference.

*Nichols* v. *Pinner* (18 *N. Y.*, 295), considered and distinguished.

APPEAL from the Superior Court of Buffalo. The plaintiffs sued to recover the amount of a note for $297, made April 11, 1856, by the defendants, payable presently. The defence was fraud in the consideration of the note.

On the trial, before a jury, the following facts appeared in evidence: At the date of the note, the plaintiffs were the holders of a check drawn by Farnham, Smedley & Kendall, on the Bank of Attica, payable to the order of and indorsed by L. R. Farnham, one of that firm, for $300, post-dated as of April 16, 1856. On that day (April 11), the plaintiffs employed one Cutting, a bill broker, to sell the check, authorizing him to allow not exceeding $4 discount. Cutting, on the same day, sold it to the defendants for $297, for which he received the note sued on. The drawer and indorser of the check failed on the same day, and when it matured the defendants caused it to be presented at the Bank of Attica for payment, which being refused, notice was given to the plaintiffs. The defendants offered to deliver up the check to the plaintiffs, and required their note to be returned, but this the plaintiffs refused; and the defendants again offered the check to the plaintiffs on the trial.

Cutting, who was examined by the defendants, swore that the check was handed to him by the plaintiffs in the afternoon, and that before selling it to the defendants, he offered it to Mr.

Chard, who declined to purchase it, and said he had one drawn and indorsed by the same parties, which had that day been protested for non-payment, and he showed the protested check to the witness. The witness and Chard talked about the different members of the firm, and Chard said he considered them perfectly good. The witness then went directly to the defendants, and sold them the check as above mentioned, without saying anything about the protested check or his conversation with Chard. Montgomery, who transacted the business for the defendants, said he considered the check good, and took it readily.

It appeared that the drawers of the check kept an account at the Bank of Attica, and were wholesale merchants, in good credit and standing, until that day, when they stopped payment; and their checks to a considerable amount, including the one mentioned by Chard, were refused payment on that and the succeeding days, and remained unpaid at the time of the trial. Some of them were post-dated like the check in question. The defendants' business was buying and selling negotiable paper and dealing in uncurrent money. The transaction took place in Buffalo, where all the parties lived.

The court charged the jury, that the non-payment and protest of the check, on the 11th April, was evidence tending to show insolvency in the drawers; that it was the duty of Cutting to communicate to the defendants what he had heard Chard say about the protest of that check, without regard to what he may have thought about the solvency of the drawers; and if he did not do so, and they were really insolvent, the plaintiffs could not recover on the note. The plaintiffs' counsel excepted to both branches of the charge. There was a verdict and judgment for the defendants, which was affirmed at a general term. The plaintiffs appealed.

*Amasa J. Parker*, for the appellants.

I. The rule of *caveat emptor* applies to the sale of mercantile paper, where it is transferred by delivery merely, without

Brown *v.* Montgomery.

indorsement. (*Baxter* v. *Duren*, 16 *Shep.*, 434, 440; *Ellis* v. *Wild*, 6 *Mass.*, 321; *Bank of England* v. *Newman*, 1 *Lord Raym.*, 442; *Chitty on Bills*, 10 *Am. Ed.*, 245, 246; *Story on Notes*, § 118, *note* 4; 15 *East*, 13, *note*, *Day's Ed.*) (1.) Sales of mercantile paper must not be confounded with cases where promissory notes or bills of exchange or checks are delivered in payment of property purchased. Thus, if they prove worthless, or are not paid, no payment is in fact made, and the party who received them may recover the consideration money, or have his remedy in some other form. (12 *Wend.*, 100; 1 *Brod. & Bing.*, 289; 5 *Eng. Com. Law*, 640, *and other cases cited on the other side.*) (2.) But where a promissory note or bill of exchange is the subject of sale in the market, it stands on the same footing as a sale of goods, and in the absence of any express representation or warranty, the rule of *caveat emptor* applies, and the vendee takes it at his own risk. This distinction is fully sustained in 16 *Shepley*, 440, 441. The question is, what was the nature of the transaction, and the intent of the parties to the transaction. (15 *East*, 13, *Day's Ed.*, *note.*) (3.) It is clear, that such a sale can be avoided only on the ground of fraud; and what constitutes fraud in the sale or purchase of property, has been recently settled in this court. Of course, it will not be denied, that the legal obligation is the same upon both vendor and purchaser. "The mere omission of a purchaser of goods, to disclose his insolvency to the vendor, is not a fraud for which the sale may be avoided. Where no inquiries are made of the vendee on the subject, and he makes no false statements, nor resorts to any artifice to mislead the vendor, it is not, in general, fraudulent in him to remain silent in respect to his pecuniary condition." (*Nichols* v. *Pinner*, 18 *N. Y.*, 295.) (4.) The quality of a piece of mercantile paper, depends on the probable ability of the maker to pay it, corresponding to the quality of an article of merchandise. Each is simply a question of value, as to which the vendee must rely on his own senses, skill, inquiries, knowledge and means of knowledge. The fact that another piece of paper, of the same makers, has been protested, may or may

not affect the value of the note sold. Although the vendor may know the fact, that a piece of the maker's paper has been protested, at the time of the sale, and that fact urges him to sell it, the vendee may, at the same time, know of facts which tend to sustain and enhance the responsibility of the maker. (5.) Would it be fraud for a vendee, on such a sale of a protested piece of paper, to conceal from the vendor, of whom he was purchasing it at a sacrifice, the fact that he had that day learned that the maker had inherited, by the death of his father on that day, a large estate? Or, would it be fraud, on purchasing the mercantile paper of an insolvent merchant, to conceal from the vendor, a fact which the vendee knows makes the paper good? (*Kintzing* v. *McElrath*, 8 *Barr.*, 467.) (6.) There is a distinction between the moral law and the common law, as to the duty of the seller to disclose facts which are within his knowledge, and which affect the risk of the buyer. " The common law is not quite so strict." (2 *Kent's Com.*, 484, 491, *notes.*) The common law rule is, that when the means of information, relative to the facts and circumstances, are equally accessible to both parties, neither of them saying or doing anything to the other, the concealment of any superior knowledge which one party may have over the other, does not affect the validity of a contract. (2 *Kent's Com.*, 484; *Laidlaw* v. *Organ*, 2 *Wheat.*, 178; *Hough* v. *Richardson*, 3 *Story*, 659.) (7.) In this case, the check was actually sold at a discount. It was purchased as questionable paper. It had four days only to run, for which $3 was deducted. That was at the rate of $273 a year, or over 91 per cent—too large a deduction for the mere use of money. It must have been for the risk and not for the use. Montgomery thought he was getting the best of the bargain. He said, he considered the check good, which shows he placed great reliance on his own judgment or on the means of information he had enjoyed.

II. The charge of the judge was erroneous. (1.) It substantially instructed the jury, that the non-payment and protest of the check were sufficient evidence on which they might find insolvency. (2.) That the concealment of the fact of protest

of another note vitiated the sale of this, provided the makers of the check were then in fact insolvent.

*Lorenzo K. Haddock,* for the respondents.

DENIO, J.   I think there was no error in the charge to the jury in the Superior Court.   The law unquestionably is, as it was assumed on the argument, that notice to the plaintiffs' agent, Cutting, while he was actually engaged in attempting to sell the check, of the failure of the drawers, was equivalent, so far as the present action is concerned, to notice to the plaintiffs themselves.

What Chard informed him, was not precisely that Farnham & Co. had failed, but that their check on the bank at which they kept their account was that day protested for non-payment.   This, *prima facie,* was notice that they had suspended payment; for when a business man in a commercial town fails to meet his paper, payable at a bank, and especially his checks upon the bank at which he keeps his account, the natural inference which every one draws is, that he is no longer able to pay his debts.   Such a circumstance may occur from oversight or accident, but those are exceptional cases.   The failure to meet the paper is itself a suspension of payment, and notice of such a fact, unaccompanied with any explanation which would give it a different character, is notice of the commercial failure of the party.   That it was so understood by Cutting and Chard is evident from the fact that they speculated upon the question, whether the members of the firm drawing the check would ultimately be able to pay.   Upon that question, Chard, as a creditor is apt to do, took the most favorable view.   It is apparent that neither of them expected the check to be paid on presentation when it should mature, five days afterwards. The Superior Court considered that the confidence which Chard expressed in the ultimate solvency of the members of the firm, did not relieve Cutting from the duty of communicating to the defendants the fact that its check had not been met.   I am of the same opinion.   Up to that time the drawers were in good

credit, and their paper of this kind, we are to presume, was promptly met. Thereafter, the holders of such paper were to be put upon their legal diligence in the courts, with a fair expectation, perhaps, that they might ultimately be able to obtain payment. The difference between a bank check having five days to run, and which is then to be paid, and a suspended debt against parties who have failed, is sufficiently obvious. The defendants purchased this check as one of the former class, while the plaintiffs' agent well knew that it belonged to the latter, and withheld that knowledge from the defendants. The plaintiffs' conduct is less censurable, morally, than it would be had it been proved that they personally knew of the failure of the drawers; but in point of law, the case is the same as though, after hearing that Farnham & Co. had failed, they took the paper which they held against them into the street, and sold it to parties who had not heard of that event. Such an act could not be justified at law any more than in the forum of conscience. The judge was therefore perfectly correct in instructing the jury, that it was the duty of Cutting to communicate to the defendants what he had heard Chard say as to the protest of the other check. He was also correct in advising them that the consequence of omitting to do so was, that the plaintiffs could not recover on the note. Where a party negotiates commercial paper, payable to bearer, or under the blank indorsement of another person, he cannot be sued on the paper because he is not a party to it; but he nevertheless warrants that he has no knowledge of any facts which prove the paper to be worthless, on account of the failure of the makers, or by its being already paid, or otherwise to have become void or defunct; for, says Judge STORY, any conceal·ment of this nature would be a manifest fraud. (*Story on Prom. Notes*, § 118.)

The plaintiffs' counsel argued that, according to the case of *Nichols* v. *Pinner* (18 *N. Y.*, 295), the plaintiffs and their agent were warranted in maintaining silence as to the failure of Farnham & Co., though they knew it and the defendants did not. But the cases are essentially different. There we

decided, that where a merchant, knowing himself to be in-insolvent, purchases goods without disclosing the fact, there being no inquiry made, he is not necessarily guilty of fraud, as he may honestly believe that he can go on and retrieve his affairs. Where so much of the trade of the country is con-ducted without invested capital, or on borrowed capital, it must often happen that a merchant who is ultimately successful has known periods of commercial disaster when his property would not pay his debts. It would be too strict to hold, that under such circumstances he must in all cases go into liquidation, or expose himself to probable bankruptcy by disclosing his condi-tion. But the case does not countenance the position, that a dealer who has been of known standing, but who has suddenly failed in business, can go to those who were acquainted with his former character, but who have not heard of his failure, and innocently purchase their property on credit. Judge SELDEN, in his opinion, puts that case as one not covered by the judg-ment.

The judge was also right in stating to the jury, that the non-payment of the check, spoken of by Chard, was evidence upon the question of the insolvency of the drawers. I have already stated what I consider the necessary inference from such a circumstance among business men. The judgment must be affirmed.

JOHNSON, Ch. J., COMSTOCK, GRAY and GROVER, Js., con-curring,

Judgment affirmed.