Oscar Keen, complainant and respondent,

*v.*

Executors of Wm. James, deceased, defendants and appellants.

1. If a vendor conceals from the vendee some fact which is material to the interest of the vendee, which is within the knowledge of the vendor, and which it is his duty to disclose, the concealment is fraudulent, and vitiates the sale.

2. A duty to disclose exists when it expressly appears, by the language of the parties, or is necessarily implied from the circumstances of the case, that one party is actually reposing trust and confidence in the other, and the latter knows it.

3. When a vendor, before and without reference to any sale, has published false statements touching the value of the article sold, and in the negotiations

for sale he is apprised that the vendee has heard those statements, and is relying on their truth in making his purchase, and has no available means of ascertaining their falsity, silence on the part of the vendor is a fraudulent concealment vitiating the sale.

4. When a sale of bank stock, belonging to an estate, was effected by one of three executors through a fraudulent concealment—*Held,* that the vendee could rescind the sale, and was entitled to a decree against all the executors for re-imbursement out of the estate, not only of the purchase-price, but also of any assessments upon the stock which he had been legally compelled to pay as shareholder.

On appeal from a decree advised by *Barker Gummere, Esq.,* advisory master, whose opinion follows:

The causes above stated were referred to me, as advisory master, for hearing, and by consent of counsel in open court were heard together; the proofs and exhibits taken and offered being evidence in each and all of the causes, so far as relevant in each.

I therefore, upon said proofs and exhibits, report to the chancellor my findings of fact and of law, and the decree which I advise to be made in each of said causes.

1. I find, as matter of fact, as follows: William James, in his lifetime and at his decease, was a director in the Mechanics National Bank of Newark, and owned one hundred shares of the capital stock. He died about January 23d, 1881; left a will, and appointed O. L. Baldwin, George F. Tuttle and his wife, Elizabeth James, executors, who proved the will on February 5th, 1881, and O. L. Baldwin became the active executor.

O. L. Baldwin, at the time of the death of Mr. James, was, and had been for many years, the cashier of said bank, and during a period of ten years prior to its failure had been continuously unlawfully paying over funds of the bank to Nugent & Co., of Newark. As early as in the year 1874, the amount he had so unlawfully advanced was about $400,000, and the amount was continually increased, month after month, until it amounted, at the failure of the bank in October, 1881, to more than $2,000,000. This defalcation, which had been carefully concealed by Baldwin, and was not actually discovered until October, 1881, extinguished the capital stock and rendered the

holders of the stock legally liable to be assessed to an amount equal to the par value of their respective shares.

In May, 1881, Mr. Baldwin and Mr. Tuttle, two of the executors of James, consulted together respecting these one hundred shares of bank stock and agreed to sell them.

In July, 1881, one Warren N. Trusdell, a broker doing business in Newark, called on Christian Wolters and asked him to buy fifty shares of the stock of this bank, recommending it as a good investment. Wolters agreed to buy them for $4,662.50, and by Trusdell's direction went to the bank and handed to Baldwin his check for the above sum as and for the purchase-money of said shares of stock, and at the same time asking Baldwin " if it was a good purchase," to which Baldwin replied " Yes," and said something about the dividend. The dividend was payable on August 1st, 1881. Baldwin gave to Wolters a formal and proper " certificate " for fifty shares of stock, accepted the check, and after paying a part of the proceeds thereof to Trusdell, the broker, deposited the balance to the credit of the James estate in said bank. He also, as executor of James, transferred on the transfer-book of the bank fifty shares of the stock belonging to the James estate to Christian Wolters, and the proper corresponding entries were made in the stock-ledger of the bank.

On August 17th, 1881, Oscar Keen purchased ten shares of the capital stock of said Mechanics National Bank from Oscar L. Baldwin, and paid him therefor the sum of $930. Baldwin delivered to him a formal and proper " certificate " for said shares, and transferred to Mr. Keen, upon the transfer-book of the bank, as executor of James, ten of the shares belonging to the estate of James, and the proper corresponding entries were made in the stock-ledger; and on August 24th, 1881, Baldwin deposited the proceeds of the sale of said shares to the credit of the James estate in said bank.

On August 23d, 1881, A. V. Van Fleet purchased thirty shares of the capital stock of said Mechanics National Bank from Oscar L. Baldwin, and gave him his check for $2,798, as the purchase-money thereof, and received from him a formal and

proper " certificate " for said shares. Baldwin, as executor of James, transferred to Mr. Van Fleet, on the transfer-book of the bank, thirty of the shares belonging to the estate of James, and the proper corresponding entries were made in the stock-ledger, and on August 24th, 1881, deposited $2,760 of the proceeds of the sale of said shares to the credit of the James estate in said bank.

On September 1st, 1881, Anna M. Keen, executrix of George Keen, deceased, acting by the advice of and through her son, Oscar Keen, purchased ten shares of the capital stock of said Mechanics National Bank from Oscar L. Baldwin, and gave him her check for $935, as the purchase-money, and received from him a formal and proper " certificate " for said shares. Baldwin, as executor of James, transferred to her, on the transfer-book of the bank, ten of the shares belonging to the estate of James, and the proper corresponding entries were made in the stock-ledger, and on September 2d, 1881, Baldwin deposited the sum of $935 to the credit of the James estate, in said bank. This sum is of precisely the same amount as that paid to him by Mrs. Keen, by her check on the previous day, and I find that, in fact, the sum so deposited was the purchase-money of said ten shares of stock.

On July 6th, 1881, a statement of the condition of the said Mechanics National Bank was published in the Newark Daily Advertiser, pursuant to the requirements of the act of congress (*U. S. Rev. Stat.* § *5211*), signed and sworn to by Oscar L. Baldwin, cashier, in which it was stated that there was " due from approved reserve agents $1,808,174.19," at the close of business on June 30th, 1881. The only reserve agent of the bank at that date was the Mechanics National Bank of New York, and from an account stated, made by that bank to the Mechanics National Bank of Newark, pursuant to the custom of their mutual dealing, and stating their mutual dealings from June 16th to July 16th, 1881, and which was received without objection, then or afterward, by the Newark bank, it appears that there was, in fact, due from the reserve agent, the New York bank, only the sum of $135,007.63. The published statement aforesaid was false. If the condition of the bank had been truly stated therein,

it would have shown a deficiency of assets to meet its liabilities, including its capital and alleged surplus of $1,673,166.56, and that the capital stock was not only without value, but that each holder was then legally liable to be assessed one hundred per cent. of the par value of the stock held by him for the payment of the debts of the bank. Wolters, Keen and Mr. Van Fleet had each seen this statement before making the several purchases of stock aforesaid, and it was one of the inducements to each to make said purchases. None of these purchasers knew that the shares they had purchased belonged to the estate of James until they discovered that fact after the bank had become insolvent.

The Mechanics National Bank of Newark closed its doors and proclaimed its insolvency on October 31st, 1881, and on November 2d, 1881, was formally adjudged, by the comptroller of the currency, to be insolvent, and Frederick Frelinghuysen was duly appointed receiver thereof; and on November 16th, 1881, the said comptroller, pursuant to act of congress (*U. S. Rev. Stat.* § *5151*), assessed upon each holder of the stock of said bank the amount of one hundred per cent. of the par value of the shares held by him, and directed the receiver to collect the same.

By virtue of this assessment, the purchasers of the aforesaid shares of stock from Oscar L. Baldwin became severally lawfully bound to pay, in respect of the shares respectively purchased by them, and they have severally paid to the said receiver, since the filing of their several bills in this court, the following assessed sums, together with interest thereon from November 2d, 1881, to wit: Christian Wolters, the principal sum of $2,500; Oscar Keen, the principal sum of $500; Abraham V. Van Fleet, the principal sum of $1,500, and Anna M. Keen, executrix of George M. Keen, deceased, the sum of $500, together with interest on said respective sums from November 16th, 1881, the date of said assessment.

During the period between September 21st, 1881, and the closing of the doors of said bank on October 31st, 1881, the sum of $52,445 was drawn out from the amount deposited therein to the credit of the estate of James.

On November 19th, 1881, Messrs. McCarter & Keen, as at-

torneys of the several above-named purchasers of the said shares·
of stock, demanded of the defendants, the executors of James, the
rescission of the.several contracts of sale of said shares; tendered
the certificates for the shares and all dividends that had been
paid thereon to the several purchasers, and demanded the return
of the purchase-money paid by each, and that each should be in-
demnified by said executors against the payment of any assess-
ment in respect to said shares of stock.    These demands were·
not complied with, and each of said purchasers filed his bill, in
December, 1881, against said executors, praying that they might
be decreed to pay to each the purchase-money paid by him to·
Oscar L. Baldwin for the said shares of stock, with interest from
the date of the purchase, and that said executors might be decreed
to indemnify them, severally, against any assessment in respect
to said shares, or to repay to each such amount as he might be·
compelled to pay under any such assessment, with interest, and
for general relief.

On December 2d, 1881, and during the pendency of these
causes in this court, the directors of the Mechanics Bank of
Newark made a proposal to the shareholders, depositors and
creditors of the bank, in which, among other things, they offered
to pay to the several shareholders the amounts assessed on their
respective shares, on the condition that they would transfer
their shares, with all their rights therein or in respect thereto, to
some person to be designated by the directors, and upon the
further condition that the proposal should be accepted, in writing,
by all the shareholders, depositors and creditors (excepting de-
positors whose deposits did not exceed $200), within sixty days
from the above date.    On January 30th, 1882, the solicitors of
Wolters, Mr. Keen and Mrs. Keen, three of the complainants,.
and the defendants, signed a stipulation, in which it was agreed
that the said complainants might accept the said proposal made·
by the said directors, without prejudice to the legal rights of the
respective parties to the said causes; and that any moneys re-
ceived by the said complainants, respectively, consequent upon
the acceptance and carrying into effect of said proposal, should
be credited by them respectively to said defendants on any

Keen v. James.

amounts recovered by said complainants in their said respective suits. Afterwards, and in order to avoid the transfer of their shares to the directors, if the said complainants accepted the proposal aforesaid, the solicitors of said complainants proposed to the solicitors of the defendants to sign another stipulation, agreeing that the complainants might receive the amounts of the assessments upon their respective shares from said directors, and that the shares should be assigned to the person named by said directors upon the final determination of the causes, and not upon signing the acceptance. The defendants' solicitors rejected the proposed stipulation, and the complainants' solicitors refused to sign an acceptance of the said proposal of the said directors. The money was not paid by the directors to the three complainants or their solicitors, and it is not proved that all of the shareholders, depositors or creditors of the bank, other than the three complainants, accepted the proposal of the directors, or that the directors waived the conditions of their proposal towards the three complainants.

2. I find, as matter of law, as follows: the fact that the several complainants, at the time that they respectively purchased these shares of stock, had no knowledge that the shares belonged to the James estate, does not change the equities between the several complainants and the defendants. The sale was, in fact, made by Oscar L. Baldwin, as an executor of the will of William James, after consultation with his co-executor, Mr. Tuttle; the shares were transferred by him, as such executor, and the proceeds of sale were deposited to the credit of the James estate, and formed part of the amount subsequently drawn out of the bank by the executors, or some of them. There is nothing in the testimony to warrant the conclusion that either of the complainants was dealing with Baldwin upon his exclusive responsibility, and upon the discovery that he was in fact acting as executor, and for the estate, they have the right to resort to the principal thus disclosed for such redress as they are entitled to. *Benjamin on Sales* § 237; *Perth Amboy Co.* v. *Condit, 1 Zab. 659.*

The legal title to the shares in question vested in the executors of James, from and after the probate of the will; and although

they hold such title *in autre droit*, they had as complete a *jus-disponendi* as if the shares were their own proper goods, and their sale and assignment of them to *bona fide* purchasers would vest in such purchasers an absolute title. *Schouler on Exrs.* § *239 ; Leitch* v. *Wells, 48 N. Y. 585.*

And as the sales of these shares were made during the statutory year next after probate, which is allowed for the conversion and administration of the assets, the purchasers were not bound to see to the application of the purchase-money; nor were they affected by the fact that the executors sustained the relation of trustees towards the creditors and beneficiaries of the testator. *Field* v. *Schieffelin, 7 Johns. Ch. 150.*

Inasmuch as the will of William James does not otherwise direct, the executors of his will are one person in contemplation of law ; their title and authority are joint and entire, and the act of one, within the scope of such authority, is the act of all. *1 Went. Off. Ex. ch. 9 ; Schouler on Exrs.* § *400.* And it results, from this legal entirety, that knowledge acquired by, or notice given to, one executor, in the course of his administration, is the knowledge of and notice to them all.

But, to have this effect, such knowledge must be acquired by, or notice given to, the executor after he has entered upon his duties, and during the course of his discharge thereof; knowledge acquired by him previously to assuming the administration cannot charge his co-executors, nor affect the estate. *Sooy* v. *State, 12 Vr. 394, 400.*

Oscar L. Baldwin, after he entered upon the discharge of his duties as executor, was continuously charged with the burden of administration of the assets of the estate, and, among others, of the shares in question in this cause, and it was his duty to use due diligence, to make inquiry for and ascertain any facts which would affect their value. Having, as cashier, constant access to the books and papers of the bank, and an intimate knowledge of its daily transactions, it was continuously his duty, as executor, to avail himself of the knowledge he thus acquired respecting the value of its shares; and while it is true that he knew, before he became executor, of the defalcations he had committed

before that date, it is equally true that after he became executor
he was continuously committing additional defalcations, and con-
tinuously knew that the shares in question were not only value-
less, but that, by reason of the ownership thereof, the estate was
liable to an assessment of one hundred per cent. of the par
thereof.   During all the period from the probate to the dates of
the respective sales of these shares to the complainants, he was
charged with the duties and acting in the office of the active ex-
ecutorship of James ; it was his duty to acquire information re-
specting the condition and value of these shares, and it would be
a metaphysical, not a legal, distinction to hold that his knowl-
edge was acquired only as cashier, and that it was withheld from
him as executor.   The knowledge was lodged in the mind of the
man during the time that he was charged with and discharging
the duties of executor, and, as executor, he knew the facts.

Even if Baldwin's co-executors be held not to have been
affected with his knowledge of the worthlessness of the shares at
the time of the several sales thereof, yet, within a few months
thereafter, and within the statutory year of administration, and
whilst, in presumption of law, the executors still held the pur-
chase-money thereof for the benefit of the estate, they were ap-
prised of his fraudulent misrepresentations to, and concealment
of facts by him from, the purchasers of said shares, and with
such knowledge, the executors refused to make redress, and re-
tained the moneys and benefits derived by means of such mis-
representation and concealment of facts.   Under these circum-
stances, although, perhaps the complainants could not maintain
an action for deceit against the executors, yet there can be no
doubt of their several rights to rescind the contracts of sale
within a reasonable time, and to require the repayment of the
purchase-money and indemnity against the assessment.   They
did rescind within a reasonable time, and the executors, by such
rescissions, and the tenders accompanying the same, were not
placed in any worse position than they were in prior to these
sales.   *Kennedy* v. *McKay, 14 Vr. 288.*

In the case of the sale of the shares to the complainant Wolters,
there were both fraudulent misrepresentation of facts and fraudu-

lent concealment of facts by Baldwin.  He not only knew that the shares were of no value, but that Wolters, by purchasing them, would be liable to be assessed to an amount equal to the par of the stock.  He knew that these facts were vital to the transaction, and that Wolters was acting upon the presumption that those facts did not exist, and that if he knew them, he would not purchase the shares.  He was, therefore, bound to disclose the facts, and to tell the truth.  He did not, but, on the contrary, told Wolters that the purchase was a good investment, thus confirming like representations theretofore made by Trusdell, who conducted the negotiations for the sale as Baldwin's broker, and who was compensated by him.  This was active fraud, and vitiated the sale.

In the case of the respective sales to Mr. Keen, Mr. Van Fleet and Mrs. Keen, there was no misrepresentation by Baldwin, or by Trusdell to the purchasers.  The report made by the bank to the comptroller of the currency was signed and sworn to by Baldwin, in the discharge of his duty as *cashier;* it was a strictly *official* act, in that capacity, and an act required by law; it was not a representation made to these parties, nor was it made in reference to this sale.  When this report was made, he owed no duty to *these purchasers,* to speak as to the condition of the bank, nor did he speak *to them;* he was not speaking for the estate of James, nor in reference to these sales, nor had that estate any connection with the report, nor can it be held liable for the false statements contained therein.  I therefore find that Baldwin made no false representations to the purchasers respecting these shares, or in connection with the sales thereof.  But, at the time of these sales, he was guilty of fraudulently concealing from them the facts then known to him as executor, as, under the same circumstances and obligations, I have above stated in respect to the sale to Wolters, and that fraud vitiates the sales to them.

If the view be taken that these executors were merely agents of the estate of James, the result would be the same.  They were certainly *joint* agents, and notice to, or the knowledge of Baldwin, acquired in the course of such joint agency, was as

effectual as notice to, and the knowledge of all the defendants. *Wade on Notice* § *681.* .

Or, if the more restricted view be taken, that in the matter of these sales Baldwin was acting as sole agent, yet it is clear that as against his principal, his *suggestio falsi* and *suppressio veri* in the sale to Wolters, and his *suppressio veri* in the several sales to Mr. Keen, Mr. Van Fleet and Mrs. Keen, gave to each of those purchasers the right to rescind the sale. *Kennedy* v. *McKay, 14 Vr. 288, 290.* And this right they have lawfully exercised.

At the time of the filing of the several bills of complaint, the several complainants were, and they are now, entitled to be repaid by the defendants the several sums of purchase-money paid by each, with interest from the date of the respective payments. Each complainant was also to be indemnified against the respective assessments made by the comptroller of the currency in respect to said shares.

Pending the suits, each of the several complainants has been lawfully compelled to pay an assessment in respect to the shares purchased by him, which was an equitable burden upon the estate of James—and there is no evidence before me that the proposal made by the directors was accepted by any of the shareholders, depositors or creditors of the Mechanics' Bank of Newark. The facts that such proposal was made, of the signing of one stipulation, and of the refusal of the defendants to sign the other, were produced in evidence by the defendants' cross-examination of Mr. Keen, and if it was intended by the defendants to set up an equity against the complainants Wolters, Mr. Keen and Mrs. Keen, arising from their refusal to accept the proposal, it was the duty of the defendants to have proved, in addition, that their acceptance of the proposal was all that was needed to make it effectual according to its terms, and to have secured the payment of their assessments by the directors. Upon the evidence before me the three complainants were not in default. Each of the complainants is entitled to be repaid by the defendants the amount assessed upon him, together with interest thereon from the date of such assessment.

There should be a reference in each cause to a master to ascertain the amount to be paid by the defendants to each of the complainants, and in taking the account the master must allow to the defendants such moneys as have been received by each complainant for dividends upon his stock after his purchase thereof.

*Messrs. C. & R. W. Parker,* for appellants.

*Mr. Wm. S. Gummere* and *Mr. T. N. McCarter,* for respondents.

The opinion of the court was delivered by.

DIXON, J.

The facts in this case proved by direct evidence are: That William James, at his death, owned one hundred shares of the capital stock of the Mechanics National Bank of Newark; that he died in January, 1881, leaving a will, in which he named his widow, Elizabeth James, George F. Tuttle and Oscar F. Baldwin as his executors, who, in February, 1881, took out letters testamentary upon his estate; that then, and for many years before, and afterwards, till its close on October 31st, 1881, Baldwin was cashier of the bank, and during a period of about ten years had been fraudulently abstracting its funds to such an extent that before the death of Mr. James the whole capital of the bank was wasted, and an assessment upon its stockholders to the par value of their stock would be required under the United States statute, for the payment of its debts; that during this period, Baldwin, as cashier, had, every two or three months, sworn to reports of the condition of the bank, made to the comptroller under U. S. Rev. Stat. § 5211, in which were willfully false statements respecting the credits due the bank, and showing in 1881 assets more than $1,600,000 beyond what the bank really had; that these reports, as made, were published according to law in a newspaper extensively circulated in the city of Newark;

that Baldwin had also, as cashier, aided in declaring semi-annual dividends upon the bank stock, which were apparently justified by the false statements of his report, but were in fact, as he knew, wholly fictitious; that by means of these published reports and dividends, a high market value had been given to the stock, so that it sold at a premium of about eighty-five per cent.; that the complainant was a business man in Newark, and, in the ordinary course of affairs, became cognizant of these reports and dividends, and, believing them to be true and genuine, in August, 1881, offered Baldwin $930 for ten shares of the stock ($50 a share being par), and thereupon Baldwin sold and transferred to him, at that price, ten shares, which he had for sale, as an executor of Mr. James, and turned the price in to the estate.

An effort was made, by counsel for the appellants, to lead the court to the opinion that Baldwin had, individually, sold the stock to the complainant, and then had purchased it from himself as executor; but we think the circumstances clearly show a sale to the complainant by Baldwin as executor.

An inference which we consider reasonably drawn from these facts is, that Baldwin perceived, when the complainant made his offer, that the latter was relying on the reports and dividends before mentioned as being substantially true exponents of the financial condition of the bank. It is scarcely possible to think otherwise. A business man, about to invest in the stock of a bank, would be almost sure to recur to the dividends which the bank had been paying, and to the statements of its condition which, within common experience, are so frequently published in the current newspapers, for information as to the propriety of investing. No other means of forming a judgment as to the intrinsic value of the stock would be open to him. And if he should be influenced by the market price of the stock, in case there were one, still he would know that that only represented in the main, the public estimate of the same *data*, and so would be relying upon their substantial accuracy. If, therefore, Baldwin adverted to the topic at all, he must have believed that the complainant, in making his purchase, was trusting in the truthfulness of these bases of opinion. And so great was the disparity

between the price offered by the complainant and the real value
of the stock, as Baldwin knew it, so enormous had been Bald-
win's defalcations, which produced the disparity, that the decep-.
tion under which the complainant was acting must have forced
itself upon Baldwin's mind.

Upon these facts the question arising is, Whether the com-
plainant, promptly claiming a rescission of the sale on Novem-
ber 19th, 1881, soon after he learned the real condition of the
bank, had a right to rescind.

If the sale is to be regarded as having been induced by Bald-
win's fraud, then the complainant's right of rescission is estab-
lished by innumerable cases, and it would make no difference,
with regard to this right, whether we consider Baldwin, the
executor, as one of the owners of the stock, selling for himself and
his joint owners, or as an agent selling for the estate which he
and they represented.   In either case, if the defrauded vendee
can make restitution so as to put the vendors in the same condi-
tion with respect to the property sold as they were in at the time
of the sale, he has the right to rescind. *1 Benj. on Sales,* §§ *636,*
*674; 2 Wms. on Exrs. 946; 2 Pom. Eq.* § *908 et seq.; Ken-*
*nedy* v. *McKay, 14 Vr. 288.*

Was, then, the sale, viewed from the judicial standpoint, in-
duced by Baldwin's fraud ?

There were no fraudulent representations made by Baldwin
pending the negotiations, but these are not necessary to taint the
contract—silence may be fraudulent.

Prof. Pomeroy, in his discriminating work on equity jurispru-
dence, very lucidly discusses the elements of fraud affecting con-
tracts, and in treating of fraudulent concealments, lays down this
proposition :  " If either party to a transaction conceals some fact
which is material, which is within his own knowledge, and which
it is his duty to disclose, he is guilty of actual fraud."   *2 Pom.*
*Eq.* § *901.*   This accords with the language of this court in
*Conover* v. *Wardell, 7 C. E. Gr. 492 :*  " It is not every conceal-
ment, even of facts material to the interest of a party, which
will entitle him to the interposition of a court of equity.   The
case must amount to a suppression of facts which one party,

under the circumstances, is bound in conscience and duty to disclose to the other party, and in respect to which he cannot, innocently, be silent."

In the present transaction, no doubt Baldwin concealed facts which were within his own knowledge, and which were very material to the interest of the complainant; the only debatable topic is whether it was the duty of the former to disclose these facts.

The author just named reduces the instances in which there exists a duty of disclosure, to three classes, the first including those where there is a previous fiduciary relation between the parties, the third including transactions which are themselves essentially fiduciary, like contracts of insurance, and the second being defined as follows: "The second class embraces those instances in which  *   *   *   it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else, from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class—each case must depend upon its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties; or they may be necessarily implied from their acts and other circumstances." *2 Pom. Eq. § 902.*

Many cases might be cited illustrating this doctrine. Besides those mentioned in the note to the foregoing text, the following may be referred to: *Martin* v. *Morgan, 1 Brod. & B. 289; Bruce* v. *Ruler, 2 M. & Ry. 3; Torrey* v. *Buck, 1 Gr. Ch. 366; Barwick* v. *English Joint Stock Bank, L. R. (2 Ex.) 259; Rawdon* v. *Blatchford, 1 Sandf. Ch. 344; Durell* v. *Haley, 1 Paige 492.*

In *Martin* v. *Morgan, 1 Brod. & B. 289,* the defendants had a post-dated check, drawn by B. on the plaintiffs. Between the day it was drawn and its date they learned that B. had become insolvent, and knowing that he had no funds with the plaintiffs to meet the check, they, nevertheless, presented it, at maturity, to

the plaintiffs for payment. The plaintiffs, supposing B. to be still in good credit and expecting to receive funds from him before the close of the day, paid the check. It was held that the plaintiffs were entitled to recover from the defendants the money paid, because the latter did not disclose what they had learned of B.'s insolvency, and purposely took advantage of the plaintiff's ignorance of that fact.

In *Bruce* v. *Ruler*, *2 M. & Ry. 3*, the defendant was a yearly tenant of the plaintiff, and wishing to quit the premises before the expiration of his term, proposed to the plaintiff another tenant whom he asked the plaintiff to accept in his stead. The defendant knew that the proposed tenant was insolvent, but did not disclose that fact to the plaintiff, and the latter accepted the new tenant. *Held*, that the defendant was guilty of a fraudulent concealment, because of which he remained answerable for the rent.

*Brown* v. *Montgomery*, *20 N. Y. 287*, was a suit on a note given by the defendants to the plaintiffs for a post-dated check of F. sold by the plaintiffs to the defendants. After the giving of the check, and before its sale to the defendants, F., the drawer, failed. His failure was known to the plaintiffs when they sold the check, but they did not disclose the failure to the defendants, who bought in ignorance of it. On discovering it, the defendants offered to rescind the sale and tendered back the check, demanding their note. The court held that the plaintiffs ought to have communicated the fact of insolvency, and that they could not recover upon the note.

In *Torrey* v. *Buck*, *1 Gr. Ch. 366*, the complainant had sold a house and lot to the defendant for $9,000, of which $5,100 had been paid in the stock of a corporation of which the defendant was cashier. In the negotiation the defendant had declined to express any opinion about the value of the stock. It was, in fact, worthless. On discovering this, the complainant offered to rescind, and filed his bill to set aside the conveyance on return of the consideration. The chancellor concluded that the defendant had known the stock to be valueless, and held that his

omission to inform Torrey of the fact was a *suppressio veri*, which called for the abrogation of the sale.

In *Barwick* v. *English Joint Stock Bank*, L. R. (2 *Ex.*) 259, the defendant's manager gave the plaintiff a guaranty that if the plaintiff would sell D. some oats on credit, to enable D. to carry out a government contract, D.'s check to the plaintiff for the price should be paid out of the moneys received from the government in priority to any other payment except of D.'s debt to the defendant. This debt was such that it would absorb all the money to be received. The manager did not disclose this fact, and the plaintiff made no inquiries about it. The court held that if the manager knew that the guaranty would be unavailing, and intended to procure the government funds for his bank by keeping back from the plaintiff the state of D.'s account, the concealment was fraudulent.

None of the cases which I have found, however, seems to present such marked circumstances to show that one party reposed trust and confidence in the other, as does that before us. Here, it is as if the complainant, when making his offer, had said to Baldwin : " I know what declarations you have made public touching the facts on which depends the value of this stock. Your means of information were such that it is reasonable to believe those declarations indicated the truth. I have no other available means of ascertaining the bank's condition. I believe your declarations, and therefore offer you this price for your stock." Although these words were not spoken, yet we think they express the mental processes of the buyer, before making the offer, and the suggestions of the seller's own mind on receiving the offer. They indicate the ground on which the parties were consciously dealing, and therefore they form a proper basis for determining whether or not one was reposing confidence in the other. Here, then, the seller sees that the buyer is trusting him, and must trust him, and is being deceived by falsehoods which he has himself set afloat, and that if he does not remove the deception, he or those whom he represents can make a profit out of it. Certainly, in this condition of things, the seller was under a duty of disclosure ; he could not, inno-

cently, be silent; silence was equivalent, in conscience, to re-assertion. For Baldwin to strike a bargain with a buyer so deceived was palpably dishonest, a willful taking advantage of his own wrong, a fraud against which a court of equity must afford relief.

Nor is it of moment that Baldwin's fraudulent acts prior to the sale had been performed by him in his office of cashier, and not in his character as executor of Mr. James. Those acts do not constitute the fraud which vitiated the contract. That was perpetrated in the sale itself by Baldwin as executor, and consisted in bargaining with the complainant, under the circumstances mentioned, without disclosing the truth. The doctrine that notice to an agent, in order to be binding upon the principal, must come to the agent in the course of his employment, is not applicable to a case of actual fraud. The fraud of the agent affects the principal for the reason that every principal impliedly warrants the integrity of his agent, at least so far as to prevent his retaining the fruits of the fraud, and if the agent, in transacting his employer's business, has unlawfully effectuated a fraudulent design, it is unimportant whence the elements of his corrupt purpose were derived.

We think it clear, then, that the complainant was entitled to rescind the sale.

On November 16th, 1881, an assessment equal to the par value of their shares was levied on the shareholders of this bank, in order to satisfy its debts, agreeably to U. S. Rev. Stat. § 5151. By reason thereof, the complainant, as holder of the shares bought from the defendants, was compelled to pay, and in December, 1881, and January, 1882, did pay, the sum of $503.75 to the bank's receiver. The decree below directs the defendants, as executors, to re-imburse the complainant for the money so paid, as well as for the original price received by them on the purchase. This is equitable. The rescission of the sale for fraud puts the parties in the position they would have occupied if the sale had not been made, and, in equity, the defendants must be regarded as having always been the holders of the stock. 2 Pom. Eq. § 915. In that capacity the estate and

funds in their hands as executors would be liable to the receiver for the assessment. *U. S. Rev. Stat.* § *5152.* The complainant having, by fraud chargeable upon the executors, been clothed with a character in which he was legally obliged to pay a debt that, in equity, ought to have been imposed upon them, is equitably entitled to re-imbursement from them, and a decree to that end, in this suit, is necessary as a part of that complete relief which a court of equity endeavors to afford in all causes brought within its cognizance.

The chancellor's decree should be affirmed.

In the appeals of the same appellants against Anna M. Keen and against Abraham V. Van Fleet, the same result is reached for the same reasons.

*Decree unanimously affirmed.*