John B. Fuller, Appellant, v. De Paul University, Appellee.

Gen. No. 39,630.

Opinion filed January 10, 1938.

WILLIAM JAFFE, of Chicago, for appellant.

TAYLOR, MILLER, BUSCH & BOYDEN, of Chicago, for appellee; PRESTON BOYDEN, CASSIUS M. DOTY and STEPHEN A. MITCHELL, all of Chicago, of counsel.

MR. JUSTICE McSURELY delivered the opinion of the court.

Plaintiff appeals from an adverse judgment in an action to recover damages for an alleged breach of an oral contract made by defendant to employ plaintiff as a teacher; defendant asserted that when plaintiff applied for employment he concealed material facts about himself which if defendant had known it would not have employed plaintiff.

At the conclusion of the evidence defendant moved the court to instruct the jury to find in its favor; ruling on this was reserved; the jury returned a verdict for plaintiff, assessing his damages at $2,000; subsequently the court sustained the motion of defendant and entered judgment for it notwithstanding the verdict, and plaintiff appeals.

Did plaintiff, by concealing at the time of his employment that he was an apostate priest from the Catholic church, thereby establish as a matter of law his unfitness to perform the employment he sought, and hence vitiate the contract of employment?

There is no dispute on the facts. DePaul University developed from the Congregation of the Mission, founded in 1623 by Vincent DePaul for the purpose of missionary and educational work throughout the world. Defendant was founded in Chicago in 1898, when the priests of the Congregation of the Mission were invited by the Archbishop of Chicago to open a school of higher learning. The trustees of defendant are members of the Congregation of the Mission. The school is not operated for profit; its primary purpose is to educate young men and women under Catholic auspices, training not only the brain but the morals and character; religious exercises and activities, such as Mass every morning and religious instruction, are part of the college routine. In 1935–1936 it had about 5,700 students, approximately 85 per cent Catholic, including approximately 1,000 nuns and between 50 and 70 priests; these nuns and priests take vows of poverty, chastity and obedience.

In August, 1935, plaintiff sought employment with defendant as a teacher of the German language; Father Corcoran was defendant's president and Father O'Connell dean of the college of liberal arts; the latter became president prior to the beginning of the 1935–1936 academic year. Father O'Connell testified that the qualifications generally demanded of professors are scholastic attainment, character, and a general fitness for association with the faculty and the student body; no one is hired "who has had anything in his past life which would make him unfit for association with our faculty or with our student body." Because of the character of the defendant college the obligation of a faculty member is greater than in an ordinary school.

When plaintiff applied to Father O'Connell for employment he called himself John B. Fuller; at this time he knew the reputation of defendant as a Catholic institution of learning; he told Father O'Connell he had been teaching German for eight years at Amherst College, that he held a Ph. D. degree from the Chicago University and that he was a Catholic; later the same day he saw Father Corcoran and told him the same thing. Plaintiff was then hired at a salary of $2,000 for the academic year commencing September, 1935, ending in June, 1936; later, in August, he received a catalogue and a communication from the president containing a detailed outline of the schedule of plaintiff's classes and notification that classes would begin September 16th; he also received notification of a meeting of the faculty to be held September 13th. September 10th he received a letter from Father O'Connell, then president of defendant, saying: "The personnel Committee on its scrutiny of your record has decided that you would not fit into the picture at De Paul. Consequently, your services will not be needed." The reason for this action was as follows: Early in September Father O'Connell received a telephone call from Techny, a Catholic community near Chicago, voicing a suspicion that plaintiff was a former priest at that community known as Father Bernard Fuller. Father O'Connell at once went to Techny and investigated. He then learned that plaintiff was the same Bernard Fuller who from about 1912 to 1927 had been a priest at Techny; that a message came there from Greece in July, 1927, announcing the death of Father Fuller in Greece and a requiem high mass was held for him in Techny.

The evidence further shows that when Father O'Connell inquired of plaintiff as to his references when he applied for employment he did not tell either Father Corcoran or Father O'Connell that he had entered the Society of the Divine Word, a religious order composed

of Catholic priests, in 1906, and was ordained a Catholic priest in 1910, taking the religious vows of perpetual obedience, poverty and chastity; that he came to Techny, Illinois, in 1911, and from 1911 to 1927 he lived there the life of a Catholic priest as a member of the Society of the Divine Word. He was then known as Father Bernard Fuller among the other members of the society and his students. He would assist other priests in different parishes in Cook county by celebrating Mass and preaching on Sundays and holy days. He was known by many of the Catholic clergy in Chicago as Father Bernard Fuller. In March, 1927, without the knowledge of his superiors or associates in Techny, he obtained a position as a teacher at Amherst College. June, 1927, he broke his vows, deserted the priesthood, married Anna Kuber in Buffalo, New York, and became what is termed a ''fugitive'' and went with his wife to various cities in Europe. Plaintiff concealed all this part of his past life from Father Corcoran and Father O'Connell. Some time after the obsequies had been held for plaintiff at Techny it was learned that he was not dead but was teaching at Amherst College. It gradually became a matter of general knowledge that he had left the priesthood and was known as a *fugitivis*.

Upon learning these things Father O'Connell at once wrote the above letter to plaintiff telling him his services would not be needed. Father O'Connell testified that if plaintiff had been hired and it had become known that defendant had an apostate priest on its faculty it would have done defendant irremedial damage; that the student body, largely Catholic, would not understand how a member of the faculty was a priest who had deserted the priesthood and violated his vows. Father O'Connell also testified that this would cause the immediate withdrawal of all the nuns and priests from defendant.

After receiving the letter plaintiff had an interview
with Father O'Connell, who explained to him that it
would do the defendant great harm if plaintiff, an ex-
Catholic priest, were employed. Plaintiff said that
this fact need not be known and he would do his best
to keep it quiet. He wrote a letter September 12th to
Father O'Connell, stating that he had been "very care-
ful and discreet not to give any scandal"; that no one,
not even his brother and sister-in-law knew about his
past; that both defendant and plaintiff should be
anxious to avoid publicity, and plaintiff suggested that
he be allowed to teach for the year, using means to keep
hidden his past experiences. Plaintiff testified that
he meant by this letter that if the facts about him
should come out he "never would have thought of stay-
ing there. I don't want anyone to know that"; and
that he "could not see how any scandal could be in-
volved because nobody knew about it." To this Father
O'Connell wrote in reply, charging plaintiff with fail-
ing to inform him of "what to us is a very essential
part of what we look for in our professors"; that de-
fendant must avoid the possibility of any scandal.

It is established by uncontradicted evidence that if
plaintiff had told defendant's representatives all the
facts about himself his employment would not have
been considered.

Plaintiff gave testimony of his unsuccessful attempts
thereafter to procure employment in other places.

Plaintiff argues in this court that the materiality of
the concealment by him was a question of fact to be
determined by the jury. Where there is no conflict in
the evidence nor dispute as to the facts, and no con-
flicting inferences, a question of law is presented, to
be decided by the court. This is the rule stated in 64
C. J., sec. 442, p. 468, and the cases there cited support
the statement, and *Libby, McNeill & Libby v. Cook,* 222
Ill. 206. In *Woods v. Bowman,* 200 Ill. App. 612, 615,

the facts were uncontroverted, and it was held that the relation of the parties was a question of law. And in 13 C. J., page 783, sec. 991, the principle is stated that ". . . if the evidence shows conclusively that a representation was made as an inducement to enter into a contract, that it was false, and that such representation was relied on, the court should direct a verdict for defendant." *Brown v. Search*, 131 Wis. 109, 114; *Mexican Amole Soap Co. v. Clarke*, 72 Ill. App. 655, 658. The concealment by plaintiff that he had been a priest of the Catholic church, taking the vows of poverty, obedience and chastity, and had officiated as a priest for many years and had subsequently left the priesthood, marrying and becoming the father of two children and what is termed a "fugitive" amounted to a material and fraudulent misrepresentation. His silence as to these things was a deception which induced defendant to employ him. The general rule is that concealment must relate to a matter material to the transaction involved. As stated in 13 C. J., page 390, sec. 294, "It may be stated as a rule that it is always material if, had it been known to be false, the contract would not have been entered into." It is undisputed in the instant case that there would have been no contract of employment if the facts ·about plaintiff had been known. A variety of illustrations might be cited. One is given in Wood on Master and Servant, page 217, where the author says that the mere fact that a servant has been guilty of wrongdoing prior to contracting for services does not of itself furnish ground for his discharge "unless he concealed it from his master and the business in which he is engaged is such that knowledge of the fact by the public would injure the master's interests. . . ."

There is some suggestion that plaintiff did not intentionally conceal from defendant facts of his past life—facts which he says were not material. We can-

not accept this. From the very nature of the employment in defendant's school, plaintiff as a former active priest must have known that the disclosure of his apostacy would have barred him from employment. He purposely represented himself as a Catholic layman so as to mislead those inquiring about his qualifications. His intentional concealment is further shown by his subsequent letter to Father O'Connell in which he suggested that he should teach, keeping hidden the facts of his past life, which he admitted if they were to become known in defendant's school would create a scandal.

The experience of hundreds of years past has shown that a teacher, to be qualified to perform his duties, must possess such a character that he may be a good example to pupils and create character in them. The teacher must be honest and honorable, not performing his duties under the cloak of honesty, but genuine, and beyond suspicion as to his character. The defendant, DePaul University, is surrounded by an unusual religious atmosphere, and to have injected plaintiff, an apostate priest, into this would have been disastrous. In *Darrow v. Briggs*, 261 Mo. 244, 169 S. W. 118, it was held that the interest of the Congregational college required the removal of a teacher who was out of harmony with the recognized religious atmosphere of the school.

Defendant's brief well states the situation: "The defendant does not suggest that the plaintiff did not act entirely within his civil rights when he violated his vows, and broke faith with his religious superiors, and became a fugitive from religious discipline; that is a matter between the plaintiff and his conscience. But the defendant does assert that the plaintiff forfeited —and must have known he forfeited—his availability for association in the capacity of a mentor, on a basis of equality and respect in educational pursuits with people who have dedicated their lives to the education

of men and women under Catholic auspices, and in a Catholic atmosphere.''

Where an affirmative defense is established by uncontradicted evidence it is the duty of the trial court to direct a verdict for the defendant. *Wallner v. Chicago Consol. Traction Co,.* 245 Ill. 148, 152; *Nelson v. Stutz Chicago Factory Branch,* 341 Ill. 387, 396. There are many other cases to the same effect. Clearly, on the established and uncontradicted facts presented by the evidence the court could properly enter no other judgment than one for defendant. The judgment is therefore affirmed.

*Affirmed.*

O'Connor, P. J., and Matchett, J., concur.