172 N.J. Super. 165 (1980)
411 A.2d 475
JEWISH CENTER OF SUSSEX COUNTY, PLAINTIFF-RESPONDENT,
v.
CHAIM WHALE a/k/a LOUIS R. WOLFISH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 1980.
Decided February 13, 1980.
*166 Before Judges LORA, ANTELL and PRESSLER.
Anthony M. Mahoney argued the cause for the appellant (Bernstein & Mahoney, attorneys; Dennis M. Mahoney on the brief).
Lewis Stein argued the cause for the respondent (Nusbaum, Stein & Goldstein, attorneys).
PER CURIAM.
The judgment appealed from rescinding the contract of rabbinical employment between the parties is affirmed substantially for the reasons set forth in Judge Polow's opinion, 165 N.J. Super. 84 (Ch.Div. 1978). We are persuaded that a rabbi's ethical and moral character is a matter which goes to the essence of his employment as a congregation's spiritual leader and educational supervisor and that a rabbi's recent disbarment as a lawyer occasioned by a series of ethical violations, his conviction of a crime of moral turpitude committed after the disbarment and his service of a custodial sentence in a federal penitentiary are facts so obviously affecting ethical and moral character as to leave absolutely no doubt of his obligation to have disclosed them.[1]
Affirmed.
*167 ANTELL, J.A.D. (dissenting).
Defendant appeals from a summary judgment which granted rescission of his contract of employment as a rabbi on the ground that, even though not asked, he failed to volunteer that he had been earlier disbarred from the practice of law and convicted of crime. This determination was arrived at even though the trial judge was told by plaintiff during oral argument that in addition to nondisclosure as a reason for rescission, defendant's written resume for the position also contained an affirmative misrepresentation as to his whereabouts between 1970 and 1977. Whereas defendant therein stated that he was then employed as an educational administrator in Israel, plaintiff presumably could prove that he was actually imprisoned for part of that time in the United States. The judge responded that this information "beclouds the issue". He preferred that the case be decided on the basis of whether there was "an absolute duty to disclose" and whether defendant's failure to do so constituted "fraudulent concealment." Thus, although the result reached below could probably have been eventually placed on a sound factual footing, the trial judge resolved the controversy by unnecessarily establishing a far-reaching and, in my respectful judgment, an unsound legal precedent.
The essence of the decision under review is found in the trial judge's conclusion that
... as a matter of law, a prior criminal record and disbarment from the practice of law must be disclosed by one seeking a rabbinical post involving the spiritual, religious and educational leadership of a religious congregation [and that failure to do so] results in damage and prejudice to the employer congregation and provides an undue, unconscientious advantage to the applicant. [Jewish Center of Sussex County v. Whale, 165 N.J. Super. 84, 92 (Ch.Div. 1978)]
This holding is affirmed by this court on the reasoning that it rests on facts "obviously affecting ethical and moral character."
If the duty of disclosure is valid in this context it cannot, in principle, be limited to information relating to conviction and disbarment. It applies with equal logic to other derogatory *168 details of an applicant's background, such as alcoholism, drug dependence, certain forms of illness and other conditions influencing behavior. It is also applicable to crimes committed by an applicant for which he has not yet been apprehended or detected. These facts are as material to the applicant's capacity to serve as a previous conviction and disbarment, and I disagree that he must volunteer these facts at peril of being later held guilty of equitable fraud.
Furthermore, the duty would seem to apply to all such misconduct, no matter how remote in time. Defendant was disbarred in 1969 and his criminal conduct, for which he was convicted in 1974, occurred in 1971. The contract of hiring began in 1978. Must he always display these infamous emblems whenever he seeks employment as a rabbi? What would be the effect of a pardon? Or an expungement of the record? These hard questions are now forecast for future cases without any compelling necessity to do this under the facts hereof.
Although no reasoned basis is given to support the court's flat pronouncement, its surface appeal in this case is obvious. However, legal propositions must be examined in their wider application as precepts to govern other cases. The difficulty here is that nothing appears in the record before us about the relationship between this rabbi and this congregation that would limit the principle of required disclosure to the present setting. No facts were found with respect thereto, no testimony was taken, and plaintiff's affidavits only state the facts of the hiring and subsequent discovery of defendant's history. Therefore, there is no way of discerning what there is about the duties entailed in the position for which he was hired which is necessary to understand why the obligation of voluntary disclosure of derogatory information is appropriate for a rabbi and not others. If the principle is valid on these meager facts, then all professionals must advise their prospective clients and patients of previous convictions of crime and suspensions from practice. Whatever differences there may be between those situations and this only *169 bear on the nature of the remedy sought, not on whether the duty exists and whether it may furnish some element necessary to a cause of action or defense to a claim.
Nor can the principle, stated so broadly as it is, stop with professionals. It would encompass businessmen seeking advancement to positions of trust, teachers, government employees and officials, and certainly candidates for elective public office. Although people who fill these occupations may not be "spiritual leaders," their rectitude and probity are matters of no less concern to those who give them their trust and confidence than defendant's are to plaintiff. Labels and talismanic phrases are no substitutes for a careful factual analysis of how defendant's history under the particular circumstances presented was so material to the terms of employment that his failure to make a voluntary disclosure thereof amounted to a material misrepresentation and therefore an equitable fraud. Accord, Weintraub v. Krobatsch, 64 N.J. 445, 449 (1974); Keen v. James, 39 N.J. Eq. 527, 540-41 (E. & A. 1885). Absent such an undertaking, the court's categorical statement of principle must apply to all applicants for any position of employment. I suggest that in reaching its judgment the court has overlooked the axiom germane to motions for summary judgment, that a "`[m]aximum of caution is necessary ... where a ruling is sought that would reach far beyond the particular case.'" Jackson v. Muhlenberg Hospital, 53 N.J. 138, 142 (1969). The significant policy questions here projected alone require that their determination rest on a plenary record and not scanty affidavits. Ibid.; Beadling v. Sirotta, 39 N.J. 34, 35 (1962); Pierce v. Ortho Pharmaceutical Corp., 166 N.J. Super. 335, 342 (App.Div. 1979), certif. granted 81 N.J. 266 (1979); McGowan v. Eatontown, 151 N.J. Super. 440, 446 (App.Div. 1977).
Long-standing authority supports the views here expressed. The rule regarding nondisclosure as a form of equitable fraud is treated in Keen v. James, supra, where the Court of Errors and Appeals explained:

*170 "It is not every concealment, even of facts material to the interest of a party, which will entitle him to the interposition of a court of equity. The case must amount to a suppression of facts which one party, under the circumstances, is bound in conscience and duty to disclose to the other party, and in respect to which he cannot, innocently, be silent." [at 540-541]
As the vice-chancellor later noted in Gordon v. Schellhorn, 95 N.J. Eq. 563, 574 (Ch. 1924), the difficulty "arises in determining whether or not any such duty exists." Guidance therefor is furnished in Keen v. James, supra, in the following language:
In the present transaction, no doubt Baldwin concealed facts which were within his own knowledge, and which were very material to the interest of the complainant; the only debatable topic is whether it was the duty of the former to disclose these facts.
The author just named [Pomeroy] reduces the instances in which there exists a duty of disclosure, to three classes, the first including those where there is a previous fiduciary relation between the parties, the third including transactions which are themselves essentially fiduciary, like contracts of insurance, and the second being defined as follows: "The second class embraces those instances in which * * * it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else, from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class  each case must depend upon its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties; or they may be necessarily implied from their acts and other circumstances." 2 Pom.Eq. § 902. [at 541; emphasis supplied]
Here the court has created a significant duty based only on its unarticulated subjective view of the relationship between a clergyman and his prospective congregation. Among the circumstances which should have been considered is the fact that defendant's ordination has never been revoked or suspended. This alone creates a fact question as to whether nondisclosure could constitute a material misrepresentation since the faith itself continues to hold him out as one of its teachers. The *171 practical effect of converting this issue of fact into one of law which was resolved by the court is to impose an absolute bar upon defendant from pursuing his calling even though the ordaining authority says he may.
Also to be considered is the likelihood of defendant's rehabilitation as a result of incarceration. While the fact of his conviction is unquestionably a factor reflecting on his ethical and moral character, it should be viewed in light of the prevailing correctional philosophy which regards reformation of the offender as one of the cardinal aims of the system.
Nor should plaintiff's total default in investigating defendant's application be disregarded. Conceivably this reflects so little interest in the applicant's ethical and moral character as not to be material in the minds of its representatives. Defendant's resume clearly invited further inquiry. It furnished the date and place of his birth and the fact that he was married. It stated that he was ordained a rabbi in Jerusalem in 1956 and that he received his B.A. from the City College of New York in 1955. His work experience shown is limited to service as an administrator in the Ministry of Education in Jerusalem from 1970 to 1977 and as a rabbi to the Parkside Jewish Center in the Bronx from 1956 to 1970. Beyond this it is silent, except to say that references would be supplied upon request.
The data which lie at the heart of plaintiff's grievance could have been discovered by the most cursory procedures had they been pursued. Moreover, if plaintiff felt it should know about defendant's criminal history, it could have asked. This is commonly done by private employers, state and federal agencies, and in connection with membership in the professions. Candidates for admission to the New Jersey Bar are in fact fingerprinted before taking the bar examination. R. 1:24 1(b). That this question might have been awkward or indelicate is irrelevant. Although clergymen are usually held in honor and esteem by the community, this does not place them beyond mortal fallibility, and plaintiff should not have expected that defendant *172 would have revealed unsolicited information carrying a moral stigma.
The trial judge's reliance upon Fuller v. DePauw University, 293 Ill. App. 261, 12 N.E.2d 213 (App.Ct. 1938) is, I believe, untenable. That case was presented on appeal from an order vacating a jury verdict for damages in favor of plaintiff after a plenary trial. Plaintiff had been hired as a faculty member by a university operated under "Catholic auspices." He did not disclose that he was an apostate priest, and when this was discovered his services were discontinued. In affirming the order under review the court emphasized that plaintiff had deeply offended the same religious institution from which he now sought employment; that from his past association therewith he knew that his misconduct would disqualify him, and that the fact of his employment on the faculty would be regarded as so scandalous as to result in the immediate withdrawal of all the nuns and priests from the university. Thus, that court's finding of a material misrepresentation was anchored to the uncontradicted facts of the case. Here, there is nothing to support the action taken below other than the court's uncritical, albeit sincere, expectations of a clergyman when he applies for employment. The fault thereof, in which I cannot acquiesce, lies in the resulting application of a sweeping principle to what is essentially a completely undefined relationship.
I do not intend to suggest that plaintiff is obliged to accept defendant's services as a rabbi to the congregation against its wishes. My concern has only been with plaintiff's right to summary judgment of rescission and not to defendant's right to specific performance of what appears to be a personal services contract. As to the latter issue, to which I have not addressed myself, see American Assoc. of Univ. Profs. v. Bloomfield Col., 129 N.J. Super. 249, 273 (Ch.Div. 1974), aff'd 136 N.J. Super. 442, 448 (App.Div. 1975), for a general statement of applicable principles.
I would reverse the summary judgment and remand to the Chancery Division for plenary hearing.
NOTES
[1] Appellant's disbarment proceedings are reported in Matter of Wolfish, 33 A.D.2d 113, 305 N.Y.S.2d 879 (1969). Appellant's criminal conviction was affirmed in United States v. Wolfish, 525 F.2d 457 (2nd Cir.1975), cert. den. 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).