Society for Establishing Useful Manufactures *v.* Butler.

*For reversal*—None.

Between THE SOCIETY FOR ESTABLISHING USEFUL MANUFACTURES, appellants, and BUTLER and TAYLOR, appellees.

The appellants were a company, incorporated with the right to take water from the river Passaic, for the purpose of furnishing power for manufacturing uses. This water was carried through a canal of three sections, which were on different levels, on each of which mills were erected under leases from the company. The mill of the appellees, who were the complainants below, was located on the upper and highest level, in which there were two

waste weirs, one of which was above the appellees' mill, and over which, and through a gate in it, the water was occasionally drawn into the lower levels : the other waste weir was below appellees' mill. A controversy having arisen between the company and the appellees touching the supply of water, a compromise was effected on the following basis: 1st. That instead of the water in the canal being discharged at the waste weir above the appellees' mill, a new waste weir, of a designated height, should be constructed below their mill. 2d. That the existing weir above their mill should be elevated so as to compel the waste water to pass over, and be discharged at the new waste weir below the mill. 3d. That the gate in the weir above the mill should not be lifted for the discharge of water from the canal, except in emergencies. The company had commenced the construction of gates in the lower weir, so as to be able to let the water out of the upper canal at will. The construction of these gates having been enjoined— *held,*

That the contract above referred to secured to the appellees these three great advantages.

1st. That the waste water of the race should always be discharged below their mill, and not above it.

2d. That the waste water should be discharged over a waste weir of a given height.

3d. That the gate above their mill should not be raised to discharge water, except in emergencies.

*Held further,* that neither, by the terms of the contract nor by implication, could the company be prevented from constructing gates in the waste weir below the mill of the appellees.

That if the contract required that no gate should be constructed below the mill of the appellees, but that all the water which was not used should be forced, as waste water, over the lower waste weir, a court of equity would not in this respect enforce it, on the ground that it gave to the appellees an unfair and unconscionable advantage.

A company incorporated to supply a water power to the community for manufacturing purposes have a *quasi* public character; they, to some extent, become the trustees of the power for great public purposes, and on this account a court of equity will not enforce, by injunction, a contract entered into by them which would prevent them from furnishing water with regularity to a large number of their lessees. The remedy for breach of such contract is at law.

When public interests or the rights of large classes.are involved, an injunction will not be granted, except upon hearing and notice, and then only when it appears clear that the injunction will not prejudice some public or *quasi* public interest.

This was an appeal from the decree of the Court of Chancery continuing an injunction. The opinion of the Chancellor is reported *ante,* page 264.

*William Pennington*, counsel for appellants.

*Joseph P. Bradley*, counsel for respondents.

The opinion of the court was delivered by

Green, C. J.    The complainants filed their bill in the Court of Chancery to restrain the Society, &c., from making certain proposed alterations in the mode of drawing water from the upper raceway of their works at Paterson, in violation of an agreement between the parties. An injunction issued pursuant to the prayer of the bill. The defendants, having answered the bill, moved for a dissolution of the injunction. The motion was denied. From this order denying the motion to dissolve the injunction the defendants appealed. The question for the consideration of this court is, whether, upon the facts disclosed in the bill, answer, and affidavits, the injunction should have been continued.

The defendants are the owners of the water power and privileges at Paterson. The complainants are the lessees, under different agreements, of eight square feet of water, drawn from the upper canal or raceway of the defendants. The water is used by the complainants as power for carrying on a very valuable and extensive paper mill, owned by them. The bill charges, that owing to uncertainty as to the head of water in the raceway, difficulty arose between the society and their tenants; that the complainants refused, on this account, to pay their rent, and an action having been brought by the society for its recovery, they pleaded an eviction of a part of the premises demised, and insisted that they were entitled to a definite head of water, which the society had no right to reduce or draw down. In the progress of the trial, the suit was compromised by the execution of a written agreement, executed for the permanent settlement of the said dispute and difficulty. Such are the allegations of the bill, and for the present purpose they will be considered as true.

The first question arises upon the true interpretation of this agreement. The injunction restrains the defendants from putting any gate or gates in the side of the upper canals in violation of the agreement. Is the construction of the gate a violation of the agreement? It is certainly no violation of the terms of the agreement. There is no stipulation by the society that no gate shall be constructed in the side of the raceway. If the agreement created such an obligation, it is by implication only. At the date of the agreement there were two weirs in the upper canal. The one was above the complainants' mill, over which the waste water flowed, and through a gate in which the water was occasionally drawn into the lower levels. The other weir was below the complainants' mill. The stipulations of the agreement are—

1. That instead of the water in the canal being discharged at the pitch or weir above the complainants' mill, a new weir shall be constructed below the mill, the top of which shall be on a level with the existing weir near the lower end of the race, and the length of which *shall* be sixty feet, and at the option of the society, may be one hundred feet.

2. That the existing weir above the complainants' mill shall be elevated so as to compel the waste water in the canal to pass over, and be discharged at the new waste weir below the mill.

3. That the gate in the weir above the mill shall not be lifted for the discharge of water from the canal, except in emergencies.

Now these plain and express stipulations secured to the lessees these great advantages, *viz.*

1. That the waste water of the race should always be discharged below their mill, and not above it, so that it should necessarily flow by their mill before being discharged.

2. That the waste water should be discharged over a waste weir of a given height, thereby fixing, by necessary

implication, the ordinary head of water in the race when there was a supply.

3. That the gate above the complainants' mill should not be raised to discharge water from the race, except in emergencies, so that on ordinary occasions the water from the race could only be discharged by means of a gate below the mill.

To these terms the complainants now seek to add others, *viz.*

That no gate whatever shall be constructed in the canal below the plaintiffs' mill for any purpose whatever, and that the entire water of the canal, when the mills are stopped, shall be forced over the waste weir.

The contract, in very plain terms, states that the defendants shall not discharge water from the race by means of an existing gate above the mill, and that the waste water shall be discharged over the waste weir. And this, it is insisted, means that the water shall not be discharged by any gate above or below the mill, and that all the water shall flow over the waste weir. And this entire change in the effect of the contract is to be produced by holding waste water to mean all the water which is not leased, or which, if leased, is not used by the lessees for the time being. It manifestly may mean, and ordinarily does mean, the superfluous water in the race when the works are in operation.

The construction sought to be given to this contract by the complainants is inadmissible, because it is not within the purview of the contract, and could not have been within the contemplation of the parties. The design of the contract, according to the complainants' own bill, was to fix a definite head, and to prevent the society from reducing or drawing down the water below that head. Now the head is fixed by the elevation of the top of the waste weir, and the complainants insist not only that the water shall not be drawn below that point, but that it shall be raised above it. It is not pretended that this contract

requires the defendants to send any specified quantity of water over the waste weir. It puts no restraint upon them in selling or leasing power. They have the unquestioned right of leasing and of using every drop of water that flows into the canal. If a lease falls in to-day, they may release it or use it to-morrow. They may exclude the water from the race, except so far as is necessary to supply the wants of the lessees. Every lessee may use or waste his own water as he pleases. The complainants do not claim a vested right to the flow of a drop of water beyond what their lease specifies, nor to a particle of head above the point designated in the contract. And yet they insist that, if every mill upon the race but their own surrenders its lease, or ceases operation; nay if their own mill stops also, the defendants are not at liberty to discharge the water from the race through a gate, but that the whole water of the river is converted into waste water, and must be forced over the top of the waste weir. Could any such contract ever have been contemplated, much less consummated, by reasonable men?

If any such result was contemplated, it would surely have been expressed in clear and unequivocal language, and not left to inference.

But if this view be erroneous, and if it must be regarded as a necessary implication, from the terms of the contract, that no gate shall be placed in the side of the race, but that all the water shall be forced as waste water over the waste weir, then the contract subjects the defendants to great obvious prejudice, without any corresponding benefit to the complainants. It gives to them an unfair and unconscionable advantage, which a court of equity will not enforce by injunction, but will leave the complainants to their remedy at law.

Thus far the question has been considered as a mere question between the parties to the suit upon the case made by the bill and upon the true construction of the contract. But there is another and more important aspect

in which this case is presented by the facts disclosed in the answer. The defendants are the proprietors of the entire water power at Paterson. The complainants are but a portion of a numerous body of lessees. The water of the river, for the purpose of furnishing power, is carried through three successive canals, upon different levels or elevations, and is used three times over in its descent from the level of the river above the falls to the level below. The complainants' mill is upon the upper canal, through which the entire body of water used at all the mills necessarily passes. The management of water in that canal, the regularity or the irregularity of its course, the mode in which it is controlled and discharged, must affect the head and the regularity of the supply at every mill upon the works. The fact of that influence is unquestioned— the extent of it is a matter of controversy, and perhaps of doubt.

The Society for Establishing Useful Manufactures is not a new private corporation for purely private purposes. Its *quasi* public character appears everywhere upon the face of its charter. The act of incorporation is a public act. It was granted because it appeared to the legislature that it would be for the public interest. The sovereign right of eminent domain was called into exercise to accomplish its purpose. It looked to the creation of a city and to the collection and support of a large and valuable population of industrious operatives, who should add to the wealth and power of the state. That end has been accomplished. The city has been created; that population has been collected; employment has been furnished to a large and industrious population, who are now mainly dependent upon the water power there created, not only for their prosperity, but for employment and the means of subsistence. The character of a public use is thus clearly impressed upon this water, and the power which it creates.

The society are not a mere private corporation, controlling that power solely for their private interests. They are,

Society for Establishing Useful Manufactures *v.* Butler.

to some extent, trustees of the power for great public purposes, and are bound to husband and use that power so as to promote the common interest of all who use it. They must, indeed as proprietors, of necessity have the control of the power, subject to the contracts into which they have entered, and a discretion as to the mode of employing and regulating it, but so as to subserve the common interest of all who use it, and consequently of all who are dependant upon it. They may not suffer their works to fall into a state of decay and dilapidation, and thus fail to furnish the power. Nor may they even contract to so alter their works as seriously to diminish or impair the value of their power. The contract may be binding upon the corporation; they may be liable for damages at law by reason of its violation; but a court of equity will not lend its aid to enforce such contract.

Now the case made by the answer is, that the alteration in the mode of discharging the water from the upper canal, made under the contract with the complainants, operated injuriously to the lessees of the mills upon the lower canals—first, by rendering the supply of water irregular, and consequently less valuable; and second, by preventing the free flow of water raising the head in the upper canal, and thus throwing part of the water over the dam, whereby the power is wholly lost. It is the attempt to remedy this difficulty, and avoid the loss which is restrained by this injunction. Is there any warrant for such exercise of the extraordinary power of the court. ? Admitting the construction given to the contract by the complainants to be the true one, will the court interfere to enforce it, to the prejudice of others equally interested in the use of the water?

If a canal company is authorized by its charter to furnish water for manufacturing purposes, and in pursuance of authority contained in its charter, contracts to furnish a given supply of water for manufacturing purposes, the

contract is valid, and the corporation is liable for its breach. But if, when the supply is furnished, it is found that the canal is injured for the purpose of navigation, a Court of Chancery would never enforce performance of the contract to the injury of the rights of navigation.

So if a company were incorporated to supply a city with water for household purposes, and under authority of their charter should contract so to construct and maintain their works as to render that supply irregular or inadequate, a court of equity would never interfere and enforce such contract by injunction.

And for the same reason, I think, the injunction should not be continued in this case. It would cause far greater injury than it could possibly remedy. It would inflict upon many the same injury from which it is designed to protect the complainants.

It is objected that the case made by the defendants is upon new facts disclosed in the answer, without denying the equity of the bill, and that in such case, by the practice of the court, the injunction will be continued to the hearing.

I think the equity of the bill is fully denied by the answer, and that there is no room for the application of the principle whose aid is invoked. But admitting that the case falls directly within the operation of the rule, there is another rule of equity equally stringent and of higher obligation, that where public interests or the rights of large classes are involved an injunction will not be granted except upon hearing and notice, and then only when it appears clear, upon bill and answer, that the injunction will not prejudice some public, or *quasi* public interest. This principle was recognised and acted upon by Chancellor Vroom, in *Scudder* v. *The Trenton Delaware Falls Co.*, *Saxton's Rep.* 694.

The injunction should be set aside.

The decree of the Chancellor was reversed by the following vote:

*For affirmance*—Judges CORNELISON, VALENTINE.

*For reversal*—CHIEF JUSTICE, Judges COMBS, OGDEN, SWAIN, VAN DYKE, CLAWSON, HAINES, RISLEY, VREDENBURGH, WOOD.