THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD
COMPANY appellant,

*v.*

THE CENTRAL STOCK-YARD AND TRANSIT COMPANY,
respondent.

On appeal from a decree advised by Vice-Chancellor Van
Fleet.

PER CURIAM.

This decree affirmed, for the reasons given by the vice-chan-
cellor.

DIXON, J. (dissenting), delivered the following opinion :

The nature of this controversy is fully stated in the opinion
of the learned vice-chancellor, reported in *18 Stew. Eq. 50.*

In my judgment, the business of The Central Stock-Yard and
Transit Company is public.   I infer this from the nature of the
business, as indicated by the company's charter (*P. L. of 1873 p.
920*), from the character of the powers granted for its conduct,
and from the explicit declarations of the charter.

The chief features of the defendant's business are the loca-
tion, construction and maintenance, within Hudson county and
adjacent to the tide-water of the Hackensack or the Hudson river,
of stock-yards, slaughter-houses, markets for live stock and dead
animals and hotels.   Of these objects, two seem essentially pub-
lic—markets and hotels.

At common law the institution of a market was deemed a
matter of such universal concern to the commonwealth, that no
person could lawfully hold a market unless it were by grant
from the king, or by prescription, which supposes such a grant;
and if any person set up a market without such authority, a *quo
warranto* would lie against him.    *Bac. Abr. tit. "Fairs and
Markets;" 12 Petersd. Abr. 553 note.*   Every person had, of
common right, the liberty of going into the market for the pur-

pose of buying and selling. *Mayor &c. of Northampton* v. *Ward, Str. 1238.*

The public nature of a hotel, which is but a modern name for an inn or public house, may be assumed without reference to authorities. That the law gave the public the right to enter and use such establishments, was one of the *data* in *The Six Carpenters' Case, 8 Rep. 146.*

These branches of the defendant's business are so closely interwoven with the others that they should be adjudged to give a public character to the whole enterprise, in the absence of indications of a contrary legislative purpose. Such indications, I am sure, cannot be found.

The business of maintaining stock-yards, for the reception of cattle belonging to others than the proprietor of the yards, is in itself so analogous to the business of warehousemen, that, in the present trend of judicial opinion, it would probably be considered lawful for the legislature to deal with it as a public employment, even if established and conducted by private individuals. *Munn* v. *Illinois, 94 U. S. 113; People* v. *Budd (N. Y. Ct. of App.), 22 N. E. Rep. 670; People* v. *Walsh (N. Y. Ct. of App.), 22 N. E. Rep. 682.* When established and conducted under corporate franchises, it should be deemed *ipso facto* a public employment; and when, as under the defendant's charter, such a business is required to be located upon public navigable waters, near the *terminus* of great trunk lines of railroad, the legislative design to make it public is plain.

Corroboratory of these inferences, drawn from the nature and location of the defendant's business, are those warranted by the character of the powers given to the company for carrying it on. By the charter, the defendant is empowered to build railroads connecting its yards with all the railways in the county of Hudson, and to lay its tracks across all the public streets of Jersey City; and by a supplemental act, passed in 1875 (*P. L. of 1875 p. 215*), it is invested with extensive authority to make police regulations, the violation of which will subject the offender to arrest without warrant, and to fine and imprisonment, while the officers necessary to enforce these regulations are to be ap-

pointed by the company and may exercise the functions of constables in criminal cases. It is certainly unreasonable to presume that these extraordinary public powers were delegated for the promotion of a private project.

The explicit declarations of the charter lead to the same conclusion.

One of these declarations is to the effect that the business of the company shall be that of "a general stock-yard and market establishment for cattle and live stock." In this sentence the adjective "general" modifies the noun "establishment" in connection with the term "market" as well as with the term "stock-yard," so that one of the ideas expressed is that of "a general market establishment for cattle and live stock." As applied to a market, the word "general" might denote either the commodities to be sold or the dealers at liberty to frequent it. Here it can scarcely have been used in the former sense, because the commodities are clearly indicated by other words in the act, and they are not general merchandise, but particular sorts only. It should therefore be regarded as denoting the persons entitled to the privileges of the market, and, so applied, it is equivalent to "common" or "public." But a succeeding clause in the charter expresses this thought without any ambiguity. The company's hotels are required to be kept "for the accommodation of the public doing business at the said yards." This language clearly indicates an expectation and purpose that the *public* might do business at the company's yards. Taking all these signs together, I think they render it perfectly manifest that the business of the defendant is public.

If this be established, then it follows that the company, in the management of its business, is bound to deal with all members of the community impartially and on reasonable terms. *Messenger* v. *Pennsylvania R. R. Co.*, 7 *Vr.* 407, 8 *Vr.* 531; *Stewart* v. *Lehigh Valley R. R. Co.*, 9 *Vr.* 505; *Atwater* v. *Delaware, L. & W. R. R. Co.*, 19 *Vr.* 55. This duty is owed not only to natural persons, but likewise to all artificial persons whose chartered powers are such as may require a demand for its performance. At the common law, all individuals, associations and

corporations (within the scope of their functions) have equal right to participate in the benefits of public occupations. *A., T. & S. R. R. Co.* v. *D. & N. O. R. R. Co., 110 U. S. 667.* This obligation does not need for its support any statute expressly creating it, but is inferred, judicially, from the fact that the employment is public.

It should, therefore, be enforced against the defendant and in favor of the complainant, unless some reason is adduced to the contrary.

Such a reason is said to be found in the fourth section of the defendant's charter, which authorizes " the corporation to make contracts with the several railroad companies in or lines running through the county of Hudson, for the transportation and delivery of live stock of every description at the yards of the said corporation." This provision, it is alleged, makes clear the intention of the legislature to impose no duty on the defendant, in favor of railroad corporations, except such as it should voluntarily take upon itself by contract.

If the business of the defendant is a private one, then it is true that the company owes to these railroad corporations no duty in the premises except such as it assumes by contract. But that would be true if this provision of the fourth section did not exist. On the same supposition, also, the company's power to contract would have been as complete without this provision as with it. So that, if the company's business is private, this clause is utterly meaningless and nugatory. If, on the other hand, the business is public, this clause becomes important. Its importance, however, does not consist in showing a purpose to exclude railroad corporations from the benefits secured to the public, and presumably to these corporations as members of the community. Of such a purpose, I find not the least trace. The language is affirmative, not negative; conferring power, not withholding or withdrawing rights. It delegates a special power, given for an end not attainable under the general grant of authority to conduct this public business, and, in my judgment, can have no other office than to allow this company to contract with these corporations for special terms, different from those enjoyed by the public at large.

It is also contended that, as these stock-yards are not on the line of the complainant's railway, the complainant is under no public duty to deliver cattle at these yards, and, therefore, can have no right so to do, and, consequently, the defendant is not required to permit such a delivery.

Assuming that the complainant was bound to transport cattle over its road, it was also bound to make reasonable provision for delivering them to the consignees at the end of the journey. As the defendant's yards were within a third of a mile of the railway, and there was no other place, fit for the keeping of cattle, so convenient, it is by no means clear that shippers would not have a right to demand of the carrier a delivery in those yards. But, if the common duty did not exist, the right of the complainant to contract for delivery at such a place is beyond reasonable doubt. Such delivery is a mere incident of the transportation which the carrying company was obliged to afford. Whether the complainant's obligation to deliver at the yards arose from public duty or from contract incidental to such duty, it acquired the right to discharge that obligation, and to that end the defendant was bound to concede to it such facilities as were due to the public generally.

The cause is now on final hearing. The right of the complainant is, in my judgment, clear, under the plain interpretation of the defendant's charter and a thoroughly settled rule of law. I therefore think an injunction should issue.

It is not worth while to consider in detail the proper terms of such injunction. It may suffice to state my belief that the case presents *data* adequate for declaring the defendant's duty specifically, and that, if the defendant should attempt to thwart or evade the writ, an effort which I am confident the company would not make, lawful means could be found for its enforcement.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, KNAPP, VAN SYCKEL, BROWN, CLEMENT, COLE, McGREGOR, SMITH, WHITAKER—10.

*For reversal*—DIXON, MAGIE—2.