Complainant seeks to permanently enjoin defendant from proceeding with a suit at law to enforce payment of two promissory notes. It is his contention that defendant's predecessor in title to the notes entered into a contract of compromise which is binding on defendant and should be performed. Defendant admits that, on several occasions, the possibility of a compromise of these obligations was discussed, but insists that there was never an integration of a contract. It charges that its assignor always conditioned any possible compromise of the obligations it held upon equal treatment with all other banks concerned; that complainant secretly intended making and effected more liberal settlements with other banks and that, in consequence, there was never a "meeting of the minds."
Complainant is a member of the bar and an active practitioner. In 1935 he was in financial difficulties. His principal creditors, with which he had been endeavoring to effect a compromise for several years, were First Camden National Bank and Trust Company, Broadway-Merchants Trust Company, Haddonfield Trust Company, Haddonfield National Bank, West Jersey Trust Company, South Camden Trust *Page 435 
Company, and American National Bank. In July, 1935, complainant met with representatives of these creditors in the law office of Henry A. Stockwell who represented Camden Safe Deposit and Trust Company, which institution was then liquidating Broadway-Merchants Trust Company and Haddonfield Trust Company, the original payees of the two notes here involved. It was proposed by the banks that complainant settle with them for $10,000, payable over a period of time, all banks to be treated alike. To this complainant agreed, insisting however that he fix the terms of payment. These terms were submitted by their representatives to each bank and, being unacceptable to several, were rejected.
On November 4th, 1935, complainant wrote a letter to C. Russell Briant, assistant treasurer of Camden Safe Deposit and Trust Company, submitting an offer of settlement of the two notes with which we are presently concerned. The offer was to pay $30 in cash and $10 monthly thereafter until $840, in all, had been paid. On December 10th, 1935, complainant wrote, withdrawing this proposal. Up to this point there is little, if any, disagreement between the parties as to the facts.
Mr. Briant testified that, after December 10th, 1935, and before the middle of the month, complainant visited him and proposed a compromise identical with that here sought to be established. It was to pay 15% of principal, 5% in cash and 10% in installments. Mr. Briant then advised complainant that, in his opinion, this proposition would not be accepted by his bank committee. He added: "all banks will have to receive the same as far as we are concerned;" we "would go along provided all banks were treated alike;" "if we accepted it it would have to be the same percentage for all bank creditors and it would be subject to the approval of our committee." Complainant, Mr. Briant testified, replied that, "He felt all banks could be treated and handled alike;" that "he didn't think he would have any trouble making disposition of his claims on that basis;" "he thought it could be arranged with all bank creditors."
Complainant denied this visit and conversation in toto, in fact, declared that, after failure of the negotiations had in *Page 436 
the office of Mr. Stockwell, he did not contact Mr. Briant until subsequent to the date of a settlement he made of his South Camden Trust Company note. However, in this interim, and on December 5th, 1935, a petition in bankruptcy was filed against complainant; asked if Mr. Briant knew of the bankruptcy, complainant testified, "Yes, I mentioned that to him, and," c. Also, very shortly after the visit and the conversation are alleged to have taken place, complainant called on Mr. Fletcher and arranged to settle the $1,000 claim of South Camden Trust Company for 15%.
After Mr. Fletcher had received payment and had returned his note to complainant by messenger, complainant personally visited Mr. Fletcher and solicited him to intercede with Mr. Briant. Complainant explained, Mr. Fletcher testified, "that he wasn't able to get anywhere with him, something to that effect." Mr. Fletcher telephoned Camden Safe Deposit and Trust Company and, Mr. Briant not being available, left a message for him. Complainant testified he heard Mr. Fletcher say, "that in my behalf he would make an offer of 15% in settlement of the obligations of the Broadway-Merchants and the Haddonfield Trust, 5% of which, that is, one-third of which was to be paid in cash and the remaining two-thirds on installments, which he set forth, without interest on the new unpaid balance, and asked he be given an answer to that message, and he also said that the West Jersey had settled their obligation, the West Jersey, liquidating the South Camden Trust Company, had done so." Mr. Briant returned the call and he testified that Mr. Fletcher "said his bank had agreed to accept 15% for the indebtedness of Mr. Van Name and wanted to know if we would do likewise, and I told him that I would refer it to our committee and let him know." After submitting the proposition to his committee, Mr. Briant again telephoned Mr. Fletcher. He testified that he "told him we would go along providing we were all treated alike." Mr. Fletcher was a witness and recollected that telephone calls had been made, but could not remember what was said.
When Mr. Fletcher made his first telephone call Mr. Briant's secretary made a written memorandum, which was *Page 437 
amplified later by Mr. Briant when he talked with Mr. Fletcher. This paper is in evidence. On it appear the following: "Mr. Fletcher" "Call him this afternoon — or Tuesday morning." "15% settlement. H. Tr. Co., Bwy. Co. 5% cash — now. 10% — monthly payments over a period of time." "W.J. Tr. Co. has accepted the offer." "Amer. Nat. will, W.J. Tr. has — 1st Cam. is taking it up to-day." "O.K."
Immediately after being told by Mr. Briant that his bank would go along provided all banks were treated alike, Mr. Fletcher telephoned complainant. Then, on that day or during the first week of January, 1936, complainant called Mr. Briant on the telephone. Complainant testified: "`Fletcher just called me and said you have accepted my offer of 15% in settlement of the liabilities to the Broadway Merchants and the Haddonfield Trust, one-third of which is to be cash, the remainder in installments' — which I recited — `without interest,' and he said, `Yes, that is correct,' and I said, `I would like to have a memorandum in confirmation of our understanding, and I will draw it and send it to you immediately,' * * *." "I then drew two separate agreements with each of these institutions, according to the names he had given me, and sent them immediately by messenger to Mr. Briant." Mr. Briant testified as to this incident: "Mr. Van Name was inquiring as to when the settlement could be effected in connection with the compromise with the Haddonfield Trust and Broadway debts, and at that time it so happened, as spoken of here before, that Mr. Fulton, our vice-president, had died, and there was some hold-up, and in addition to that, Henry Stockwell, I believe, was away at the time, he hadn't seen the agreement to be approved as to form, and I told Mr. Van Name as soon as the agreements were received we would be ready, with Stockwell's approval we would be ready to effect a settlement."
Complainant then personally drew two separate written agreements, one to effect settlement of the note of Broadway Merchants Trust Company, and the other, of Haddonfield Trust Company. He sent these, by messenger, to Mr. Briant.
Complainant testified that he called Mr. Briant on the telephone on December 31st, 1935, and again on January 3d *Page 438 
1936. It is his testimony that Mr. Briant told him, on the first of these occasions, that the agreements "were O.K. except for Mr. Stockwell's approval as counsel." Complainant also testified that he told Mr. Briant "about completing my settlement with the American National Bank and that I was relying on him to get the signatures on the memoranda I had sent him." On the second occasion complainant testified, that he said to Mr. Briant: "I am now about to complete my settlement with the Haddonfield National Bank and I must be sure that you are going to get me those signatures," and he said, "`It is perfectly all right,' `Well,' I said, `has the thing been accepted?' and he said, `Yes, I have already told you that,' and I said, `Has it been approved by the boards of both banks?' and he said, `Yes, go right ahead with your settlement with the Haddonfield National Bank and I will get you the signatures. The only thing I am waiting for is Mr. Stockwell's approval.'"
Next, complainant's wife made a 30% settlement with the Haddonfield National Bank; she paid $209 in cash and, with complainant, executed a mortgage on her home to secure the balance. Shortly thereafter an officer of the First Camden National Bank informed Mr. Briant of this settlement. Mr. Briant then, on January 13th, 1936, called complainant on the telephone and asked him to come to the bank; he did so on January 14th, 1936. Complainant's version of the conversation was: "He said, `Have you settled with the Haddonfield National Bank?' and I said, `Yes,' and he said, `On what percentage?' and I said, `30%,' and he said, `Was it all cash?' and I said, `No, part cash and part security given by Mrs. Van Name,' I said, `I suppose that is the equivalent of cash,' and then I said, `I would like to have the agreements,' and he said `I have them there,' and he showed them to me, and the one with the Broadway Merchants had up in the top corner of the first page, in ink, `O.K., H.F. Stockwell,' and Mr. Briant struck that off and said he didn't know whether they were going to go through with the deal or not, that he would have to take it up with his committee on, I think he said, January 20th, and I said, `Well, our agreement is already made, and I relied on it' — but I thought there was *Page 439 
no use starting an argument with him, because I thought the committee would stick by what he had told me and I said, `All right, let me know,' and he wrote me the following day, evidently he didn't even wait ____"
Mr. Briant agreed that a telephone call had been made by complainant just at the end of 1935. Complainant, he said, asked whether or not the compromise offer made through Mr. Fletcher had been approved; he replied that it had; he then talked with complainant about the compromise, "which we had approved with the understanding that all banks would be treated equally." He said he had "told Mr. Van Name, that if we accepted it it would have to be the same percentage for all bank creditors and it would be subject to the approval of our committee."
On January 15th, 1936, Mr. Briant wrote complainant a letter advising him that, after consultation with the committee of the bank, complainant's proposition of a 15% compromise was not acceptable. The letter contained this paragraph:
"As previously stated our committee had approved of this settlement, provided all creditors were being treated alike. Now that you have informed me that you are arranging to pay the Haddonfield National 30% of their claim, our committee will not approve the acceptance of your 15% offer. We must, therefore, insist upon the same settlement that the Haddonfield National is accepting."
On January 20th, 1936, complainant wrote Mr. Briant declaring that the bank's acceptance was not conditioned upon receipt by all other creditors of the same amount and that complainant intended to hold the bank to its bargain. On the same day Mr. Briant replied:
"This is to advise you that you specifically told me that the Haddonfield National Bank had been offered 15%, the same percentage that you offered us. When I advised you that our committee had approved of this settlement I was under the impression that the Haddonfield National Bank was likewise accepting settlement on the same basis."
On January 31st, 1936, Mr. Briant wrote complainant, returning to him the forms of agreement he had submitted *Page 440 
and which the banks had refused to sign. On January 24th, 1936, the 30% settlement with Haddonfield National Bank having been completed, the bankruptcy petition was, on complainant's application, withdrawn. First Camden National Bank and Trust Company, Camden Safe Deposit and Trust Company and Haddonfield Trust Company then threatened to file an involuntary petition in bankruptcy.
On October 2d 1936, Louis B. LeDuc, Esquire, with the approval of complainant, wrote to Camden Safe Deposit and Trust Company offering an all cash settlement of 15% of the two notes here involved. This offer contained no reference to the contract of compromise complainant now maintains had previously been effected; also, the amounts originally due on the notes are given in the letter as the sums to be compromised, not reduced amounts.
Other significant circumstances must be discussed. When complainant received word from Mr. Fletcher that Camden Safe Deposit and Trust Company would settle, he apparently indicated no surprise at its sudden and unexplained reversal of attitude and made no inquiries as to terms or conditions. He immediately suggested that he draw formal agreements and drew two, one for each bank. Submission of two agreements, he argued in his testimony, should have indicated to Mr. Briant that he was no longer expecting to treat all banks alike but was about to make separate settlements. His testimony discloses, however, that Mr. Briant told him an agreement covering the Broadway Merchants Trust Company note could be made by Camden Safe Deposit and Trust Company, but that Haddonfield Trust Company, to that extent, was still a functioning unit.
He did not personally take the agreements to Mr. Briant and, therefore, there was no discussion or opportunity for discussion as to terms or conditions or as to phraseology used; complainant had the agreements delivered by messenger. Up until that time, according to the evidence, Mr. Briant and Camden Safe Deposit and Trust Company had always taken the position that they would make no settlement unless all banks were treated alike. When Mr. Briant received these agreements and examined them he was still under the impression, *Page 441 
he testified, that a 15% settlement was being made with all the interested banks. The wording of the agreements submitted would confirm that impression.
Complainant, in drawing each of these agreements, first recited the discount of the note, then the fact that an involuntary petition in bankruptcy had been filed against him, and then the following paragraph:
"And Whereas, the said Elmer G. Van Name is unable to meet said note and his other financial obligations but is willing to devote some of his future earnings to the payment of a compromise amount, to which certain other banks have agreed: NowTherefore," c.
Notwithstanding complainant's choice and use of the words, "to which certain other banks have agreed," he admitted that he "knew" he could not settle with the First Camden National Bank and Trust Company; that he had actually settled with but one bank, West Jersey Trust Company liquidator of South Camden Trust Company; that with one, the American National Bank, he was hoping to settle for 10%; and with another, Haddonfield National Bank, negotiations had been opened by his wife — which later resulted in payment of 30%.
Complainant, interrogated by the court as to whether or not he had specifically told Mr. Briant that he was dealing separately with each bank, replied: "No I don't think I specifically told him by express words that I was dealing with these banks separately."
Further interrogated as to why he had added the concluding words to the paragraph quoted, complainant gave a lengthy and involved explanation: "In drawing that agreement it was dictated immediately after confirming the arrangement with Briant at a time the day before Christmas when my secretary was about to miss her train to Washington and was anxious to get the next train for her vacation. I didn't take the time to look up any law, but I recognized when a larger obligation is exchanged for a smaller obligation there must be a consideration, and I thought it was a good idea to recite something to charge the banks with what might be called an estoppel as a consideration, so the only thing I could think of offhand were three ideas, without trying to *Page 442 
analyze them; first, there was a bankruptcy pending, second, I was insolvent, and third, that other banks were going along, and I was trying to draw in, for my own benefit, the agreement I had made with the South Camden Trust Company, and the agreement I was morally sure I could make with the American National Bank, which I intended to make, and the agreement I knew I would be forced to make on some terms with the Haddonfield Trust, but I knew, however, I couldn't use the language `all other banks' because I knew then I couldn't get the First Camden National, and I also knew I was going to have the bankruptcy proceedings dismissed if I was able to get the largest creditors, or a majority of the creditors, and I didn't know what the fact would be, and therefore I avoided specifically the names of other banks going along, avoided any reference to the percentage that those banks were to be paid, avoided any reference to the payments to the other banks, or any reference to security, all of which were in the making. Therefore, in my haste I thought, `I will include in the agreement whatever I can think of offhand which will be a consideration, or a semblance of a consideration, to legalize the reduction in the obligation,' which, of course, was beneficial to me, and without looking up any law, took a chance I had, by omnibus methods, gotten a consideration expressed."
It has seemed necessary to the court that the facts and the testimony be recited in considerable detail. Complainant has not questioned the fact or justness of his liability for principal and interest on the two promissory notes. He sought to effect a compromise of those obligations for 15% of the principal amounts. He prays the intercession of this court to halt the prosecution of an action at law, and seeks to here establish an oral contract and to, in effect, enforce its specific performance. Necessarily, he submits his motives and conduct to the scrutiny and judgment of equity and must rely upon the exercise of its sound legal discretion. The exercise of that discretion is aided, guided and controlled by certain long established principles:
An injunction is not granted as a matter of right, but its granting or refusal rests in the sound discretion of the court, *Page 443 
under the circumstances and the facts of the particular case. It is the strong arm of equity. "There is no power, the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, and which is more dangerous in a doubtful case than the issuing of an injunction." Judge Baldwin, in Bonaparte v. Camden and Amboy Railroad Co., Bald.C.C. 205, 217, Fed. Case No. 1, 617; Society for EstablishingUseful Manufactures v. Morris Canal and Banking Co., 1 N.J. Eq. 157,192; Citizens Coach Co. v. Camden Horse Railroad Co.,29 N.J. Eq. 299, 303; Kelly v. Kelly-Springfield Tire Co.,106 N.J. Eq. 545; 152 Atl. Rep. 166; Auburn Button Works, Inc., v.Perryman Electric Co., Inc., 107 N.J. Eq. 554; 154 Atl. Rep. 1;Benton Holden, Inc., v. Central Railroad Company of NewJersey, 122 N.J. Eq. 309; 194 Atl. Rep. 805; affirmed, 123 N.J. Eq. 163; 196 Atl. Rep. 352; Adams v. Adams (Court of Errorsand Appeals), 125 N.J. Eq. 166; 4 Atl. Rep. 2d 58;Benton v. Kernan (Court of Errors and Appeals), 126 N.J. Eq. 343; 8 Atl. Rep. 2d 719; modifying 125 N.J. Eq. 412;6 Atl. Rep. 2d 195.
Equity respects the rights and proceedings of co-ordinate tribunals and is always reluctant to interfere with an action at law. It is only when the circumstances disclose that it would be against conscience to permit a party to proceed in the law court that it will interfere by injunction. Long Dock Co. v.Bentley, 37 N.J. Eq. 15; affirmed, Ibid. 330; Teas v. ThirdNational Bank and Trust Co. (Court of Errors and Appeals),125 N.J. Eq. 224; 4 Atl. Rep. 2d 64; New York LifeInsurance Co. v. Stein (Court of Errors and Appeals),126 N.J. Eq. 259; 8 Atl. Rep. 2d 555.
An injunction to restrain a breach of contract often operates as, and effects all the purposes of, a decree for specific performance. As a general rule, to enjoin one from violating a contract is an indirect method of enforcing its affirmative provisions. The jurisdiction exercised is in substance the same, and the same general rules apply in the one case as in the other:28 Am. Jur. 272 ¶ 78; 32 C.J. 186 ¶¶ 281 and 282; LehighStructural Steel Co. v. Atlantic Smelting and Refining Works,92 N.J. Eq. 131; 111 Atl. Rep. 376. *Page 444 
"Courts of equity will not interfere to decree specific performance except in cases where it would be strictly equitable to make such a decree." Anselmo v. Franck, 109 N.J. Eq. 480;158 Atl. Rep. 103. And, "the power of injunction committed to this court is a delicate and a most important power, and should always be exercised with caution — to prevent, not to do mischief — to protect and sustain, not to render the enjoyment of rights and property uncertain." Cornelius v. Post, 9 N.J. Eq. 196;Williams v. M.E. Blatt Co., 95 N.J. Eq. 326;123 Atl. Rep. 362.
The remedy by injunction is an extraordinary one and may not be awarded to any suitor unless and until his right to it is established by clear and convincing testimony, free of all reasonable doubts. If complainant's asserted right is doubtful or disputed, equity will move cautiously before determining to grant him a remedy by injunction. Society for Establishing UsefulManufactures v. Butler, 12 N.J. Eq. 498; Delaware, c.,Railroad Co. v. Stock-Yard and Transit Co., 45 N.J. Eq. 50, 65,66; affirmed, 46 N.J. Eq. 280; 19 Atl. Rep. 185; 6 L.R.A. 855;Marvel v. Jonah, 81 N.J. Eq. 369; 86 Atl. Rep. 968; reversed in part, 83 N.J. Eq. 295; 90 Atl. Rep. 1004; L.R.A. 1915 B 206;Underwood v. Herman Co., 82 N.J. Eq. 353; 89 Atl. Rep. 21;Muller v. Cavanaugh, 94 N.J. Eq. 619; 121 Atl. Rep. 339.
The burden of establishing the right asserted is upon him who asserts it. 28 Am. Jur. 217 ¶¶ 24, 25. "It will not suffice for the complainants to leave the proofs in such shape that a reasonable doubt remains, for to doubt is to deny." Bennett v.Haerlin, 107 N.J. Eq. 224; 152 Atl. Rep. 164; reversed, 112 N.J. Eq. 285; 164 Atl. Rep. 461; Delaware, c., Railroad Co. v.Stock-Yard and Transit Co., supra. "If the existence of a contract is in doubt or its existence is not proved with that degree of certainty which the law requires, * * * an injunction against a breach thereof will be refused, the relief being improper where it is not clear what acts are to be performed."32 C.J. 190 ¶ 287; Meaney v. Stork, 80 N.J. Eq. 60;83 Atl. Rep. 492; affirmed, 81 N.J. Eq. 210; 86 Atl. Rep. 398; Union Inv.Co. v. Fiske (Chancery), 107 Atl. Rep. 65. *Page 445 
A party seeking injunctive relief "must show himself free from all just imputation of wrongdoing in connection with the contract forming the subject of his application." If the right asserted is an alleged contract right, equity will not enforce it if it has been dishonorably obtained; he who seeks the aid of equity must have done equity in respect to the matter before the court.Spelling on Injunctions and Extraordinary Remedies (2d ed.) ¶ 479; 32 C.J. "Injunction" ¶¶ 49 to 58 and ¶ 291;28 Am.Jur. 226 ¶ 33; p. 229 ¶ 34; p. 275 ¶ 80; Munn Co. v.The Americana Co., 82 N.J. Eq. 63, 443; reversed, 83 N.J. Eq. 309; 91 Atl. Rep. 87; L.R.A. 1916 D 116; Welitoff v. Kohl
(Court of Errors and Appeals), 105 N.J. Eq. 181;147 Atl. Rep. 390; 66 A.L.R. 1317. Silence may be fraudulent. "If either party to a transaction conceals some fact which is material, which is within his own knowledge, and which it is his duty to disclose, he is guilty of actual fraud." 2 Pom. Eq. ¶ 901; Keen v.James (Court of Errors and Appeals), 39 N.J. Eq. 527, 537;Teas v. Third National Bank and Trust Co., supra. "The test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct; whether the author of a proximate cause may justly repudiate its natural and reasonably anticipated effect; fraud, in the sense of a court of equity, properly including all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." * * * "While it cannot be said to be ordinarily any part of duty to apprise an adversary of his rights, it must be recognized that one cannot justly or equitably lull his adversary into a false sense of security," c. Vice-Chancellor Leaming, Howard v. West Jersey, c., RailroadCo., 102 N.J. Eq. 517, 521, 523; 141 Atl. Rep. 755; affirmed,104 N.J. Eq. 201; 144 Atl. Rep. 919.
Complainant cites and relies on a single decision — TrentonStreet Railway Co. v. Lawlor, 73 N.J. Eq. 203;75 Atl. Rep. 996; 74 N.J. Eq. 828; 71 Atl. Rep. 234; 74 Atl. Rep. 668. *Page 446 
That case, under the evidence before this court, could not be considered authority for advising issuance of an injunction; Mr. Justice Trenchard, speaking for the Court of Errors and Appeals, emphasized the fact that a definite contract of compromise had there been clearly proven. The facts are fully disclosed in his and the Vice-Chancellor's opinion: Just before a negligence case was to have been tried, a settlement was effected; the offer of defendant was submitted to the plaintiff by his counsel in the presence of two of his friends; he asked one of his attorneys to secure additional moneys to cover witness fees; defendant agreed to pay $50 more; public announcement was then made in court that the suit had been settled, the jury was discharged and the court adjourned. Plaintiff later refused to execute a release and secured other counsel; defendant filed a bill in this court for an injunction against further prosecution of the suit at law and for specific performance of the contract of settlement. The facts were established before the Vice-Chancellor by the testimony of plaintiff's attorneys and the testimony of one of his two friends present when the offer was communicated to him. Mr. Justice Trenchard said, "The evidence clearly shows that Lawlor gave Mr. Budd, his attorney, authority to settle for $1,850." The decisions of the Court of Errors and Appeals in Headley v.Leavitt, 65 N.J. Eq. 748; 55 Atl. Rep. 731, and Headley v.Leavitt, 68 N.J. Eq. 591; 60 Atl. Rep. 963, were cited by Mr. Justice Trenchard. The facts in those cases also demonstrated that a definite contract of compromise had been concluded by the parties and confirmed by their subsequent conduct. Chief-Justice Gummere, in his opinion in the latter case, said, "The testimony of the receiver makes it clear that an agreement was entered into between Mrs. Leavitt and the appellant," c.
In Howard v. West Jersey, c., Railroad Co., supra, Vice-Chancellor Leaming advised an injunction restraining the interposition of a defense of the statute of limitations in a law court. The facts justifying an injunction were found by the Vice-Chancellor to have been clearly established.
Counsel for both the complainant and the defendant have referred to the case of Hudson v. Columbian Transfer Co., *Page 447 137 Mich. 255; 100 N.W. Rep. 402, and approved of this statement by the court: "What is meant by `meeting of minds' is the agreement reached by the parties and expressed. As is well said in Brewington v. Mesker, 51 Mo. App. 348, `The meeting of minds which is essential to the formation of a contract is not determined by the secret intention of the parties, but by their expressed intention, which may be wholly at variance with the former.'" To the same effect are the words of Mr. Justice Heher in Corn Exchange National Bank of Philadelphia v. Taubel
(Court of Errors and Appeals), 113 N.J. Law 605;175 Atl. Rep. 55, "The obligation of a contractor depends upon his expressed, not his actual, intention."
It is complainant's insistence that his offer, in definite terms, was made to Mr. Briant through Mr. Fletcher. He constituted the latter his agent for that purpose and to receive and report acceptance or rejection. Complainant testified that Mr. Fletcher, in telephoning his offer, made mention of one bank: "only the reference to the South Camden transaction, which had been consummated." However, Mr. Briant's memorandum, introduced into evidence by complainant, convinces me that others were mentioned then or in the conversations which followed between Mr. Fletcher and Mr. Briant. That memorandum is written, partly with a red pencil and partly with a black. In black there appears at the top of the paper three statements which Mr. Briant said were written by his secretary when she advised Mr. Fletcher that Mr. Briant was not available: "Mr. Fletcher" — "Call him this afternoon, or Tuesday morning." "W.J. Tr. Co. has accepted the offer." Then, in red, Mr. Briant wrote: "15% settlement. H. Tr. Co., Bwy. Co. 5% cash — now. 10% — monthly payments over a period of time —. Amer. Nat. — will; W.J. Tr. — has. 1st Cam. is taking it up to-day."
The information evidenced by this writing was, I am convinced, given to Mr. Briant by Mr. Fletcher, complainant's agent. Whether Mr. Fletcher so informed complainant, is not clear; the former testified that he had no recollection, and complainant, although he testified that Mr. Fletcher had reported acceptance of the offer, was silent as to any other *Page 448 
statement which Mr. Fletcher may then have made. Having found as a fact that possible settlement with other banks was discussed between Mr. Fletcher and Mr. Briant, and, finding as a fact that Mr. Briant did stipulate that all banks were to be treated alike if settlement was to be made by his bank, it necessarily follows that it became the duty of Mr. Fletcher to fully inform his principal, the complainant. If he did, and complainant hoped to mislead Mr. Briant and his banks, the reason for complainant's use of the questioned phrase in the agreements becomes clear; if Mr. Fletcher did not disclose essential facts to complainant that is unfortunate for the latter; a principal is charged with such carelessness of an agent. Keen v. James, supra.
Negotiations between complainant and his bank creditors had been conducted over a period of years; they culminated in the meeting in Mr. Stockwell's office where complainant agreed that any moneys paid should be distributed proportionately among all the banks. I am convinced that Mr. Briant told the truth when he testified that he advised Mr. Fletcher of his doubt that his bank would go along on complainant's 15% proposition and was certain that it would not unless all banks were treated alike. Such a statement would be natural in view of the established and undisputed attitude of his bank up to that time and consistent with the admitted fact that complainant sought the aid of Mr. Fletcher because he could not get along with Mr. Briant. There could be no reason for Mr. Fletcher and Mr. Briant to discuss action taken or proposed by the other banks if settlement with them was not to be a consideration influencing any possible compromise. It was complainant who was seeking to compromise. If he intended Mr. Briant to understand that he was about to deal differently with the several banks why did he not personally visit him, as he had before, and lay the true facts before him? On the other hand, if complainant wished to persuade Mr. Briant to abandon or forget his insistment that all banks were to be treated alike, his use of Mr. Fletcher and of the fact that South Camden Trust Company had accepted a 15% settlement, is understandable.
Pertinent to the above discussion are these facts: Complainant *Page 449 
testified that, being advised by Mr. Fletcher that Mr. Briant had accepted complainant's proposition, he called Mr. Briant and said that he had heard from Mr. Fletcher that his offer had been accepted. He testified that he then restated in detail the terms of that offer, which ignored any suggestion of the condition that a like settlement was being or would be made with the other banks. Mr. Briant, he alleges, answered simply: "Yes, that is correct," and this, although it meant a sudden and unexplained reversal of attitude by not only Mr. Briant but by his two banks. That complainant was willing to treat his bank creditors differently is beyond question: He testified that through a director of one of the banks, an intimate personal friend, he was "morally sure" of effecting a 10% settlement with that institution. Complainant admits that when he dictated the agreements he had in mind future litigation and preparation for a defense; he possibly anticipated rejection of his proposition by Camden Safe Deposit and Trust Company, which occurred promptly upon its being informed that a 30% settlement was being made with another bank.
I am persuaded by the testimony, and must find, that complainant hoped and planned to have the two banks in question accept his 15% proposition without divulging the true situation and before they could learn that other banks were being offered more favorable terms. If I had any doubt as to this intention of complainant, his conduct in drawing and submitting the written agreements would force conviction. The phrase "to which certain other banks have agreed" was chosen and inserted, complainant testified, to "specifically" avoid giving the "names of other banks going along," or making any reference to security given, payments made, or percentage to be paid other banks. It was selected and used to express "consideration or a semblance of a consideration." Complainant said: "I was trying to draw in, for my own benefit, the agreement I had made with the South Camden Trust Company, and the agreement I was morally sure I could make with the American National Bank, which I intended to make, and the agreement I knew I would be forced to make on some terms with the Haddonfield Trust," *Page 450 c. His lengthy, involved and confused explanation of his addition of this phrase did not appeal to me as that of a person who had been frank with his creditor and was willing to be frank with the court; it is inconsistent with his admitted failure to disclose to Mr. Briant, at any time during the negotiations, the fact that he was making separate and different settlements with other banks, and his self-evident reluctance to call upon Mr. Briant after he conceived that he had bound the two banks to a bargain of compromise.
Complainant intended, he testified, in the event that the two banks executed the written agreements, to have available the defense of estoppel. He urges that defense here. He relies on his testimony and that of his secretary that he advised Mr. Briant he was going forward with settlement of the claim of Haddonfield National Bank, and the alleged assurance of Mr. Briant that he might proceed, as his offer had been accepted. However, it is also the testimony of complainant that his wife, without his knowledge, had initiated the negotiations with that creditor and that she effected the settlement, personally paying the cash consideration, and giving a mortgage on real estate she owned. When it must have seemed important to complainant to prove that he was not deceiving these two banks, he testified that this transaction was that of his wife; when he obviously was laying a foundation for a possible defense of estoppel, he testified that the settlement was his.
Complainant does not deny that up until the meeting in Mr. Stockwell's office negotiations between complainant and his bank creditors had been conducted on the basis of treating all banks alike. He does not deny that such was the proposition submitted to him by the bank representatives in Mr. Stockwell's office. He does not deny that up to and including that time such was the insistment of Mr. Briant and Camden Safe Deposit and Trust Company. Complainant suggests that his subsequent submission of a settlement offer to Camden Safe Deposit and Trust Company, the offer which he almost immediately withdrew, should have been notice to it that he was then and thereafter desirous of dealing separately with the several banks. If complainant intended the bank *Page 451 
to so understand, the fact could have been simply stated; the letter coming after the conference might more logically be construed as presenting a proposition being made to all bank creditors. Complainant also calls attention to the fact that his version of the three conversations he had with Mr. Briant were exactly corroborated by his secretary. The happening was unusual: His secretary testified that she habitually listened when complainant held telephone conversations with clients or others; that she listened in each of these instances and that she took notes; the notes were not produced or referred to; she denied that she and complainant had discussed what her testimony was to be and, although six years had passed since the conversations occurred, she testified in words almost exactly those of complainant and to every point that might be important to him. However that may be, the conversations to which she testified did not serve to divulge complainant's intention to deal separately with the several banks and did not change the impression Mr. Briant had that all banks were to be and were being treated alike. This testimony of complainant's secretary but serves to emphasize complainant's failure to divulge any information as to the true situation.
Complainant argues that retention, for a period, of the two written agreements, the submission of those agreements to counsel for approval as to form, and the statements of Mr. Briant that they were satisfactory and would be executed, conclusively prove that a complete contract was effected, which contract is as binding upon the banks as if the written instruments had been executed by their officers. If it be assumed, for purposes of illustration, that they had been executed, and that subsequently, the banks discovered complainant was dealing more favorably with another bank, what would have naturally followed? The banks, undoubtedly, would have been the moving parties here; under the facts as they have been proven, they would be seeking the aid of this court to declare those agreements of no effect, alleging that their execution was obtained by fraud. Relief would not depend upon direct proof of fraudulent representations; such are not necessary to taint the contract — silence may be fraudulent. *Page 452 Suppressio veri, as well as suggestio falsi, may warrant rescission of a contract. Keen v. James, supra, quoting 2Pom. Eq. 901.
The evidence convinces me that no contract of compromise was effected; that at no time did the parties "express" an intention to or contemplate making the same contract; that the two banks involved believed, and were justified in believing, that all banks were to be treated alike if any compromise was to be made, and that, although it was the intention and plan of complainant to treat and settle with his bank creditors separately and on different terms, he not only failed to disclose that intention and plan to these two creditors but, by his silence and affirmative act, confirmed that belief.
Even if I were not convinced by the evidence that there was here no integration of a contract, I could not hold that complainant would be entitled to relief. Under the burden of proof rule he assuredly could not be said to have established the contract for which he contends, and, in view of the evidence detailed and discussed, I would be forced to conclude that, with respect to the matter before the court, he has not done equity. I am satisfied that I should not, in the exercise of sound judicial discretion, advise the Chancellor to grant injunctive relief to complainant.